**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

No. 17-CR-03338-JMC

MILTON BOUTTE, JOE DIAZ,
ARTURO VARGAS, and
GEORGE LOWE,

Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT MILTON BOUTTE'S MOTION FOR BILL OF
PARTICULARS [DOC. 32]; DENYING DEFENDANT[] MILTON BOUTTE'S MOTION
TO DISMISS THE INDICTMENT, AS TO MILTON BOUTTE, PURSUANT TO
FEDERAL RULES OF CRIMINAL PROCEDURE 12(b)(3)(B)(iii) AND 12(b)(3)(B)(v)
[DOC. 34]; DENYING DEFENDANT GEORGE LOWE'S MOTION TO DISMISS
UNTIMELY INDICTMENT [DOC. 61]; AND DENYING DEFENDANT ARTURO
VARGAS'S MOTION FOR A BILL OF PARTICULARS [DOC. 69]**

On November 28, 2017, a grand jury charged Defendants Milton Boutte, Joe Diaz, Arturo

Vargas, and George Lowe with multiple counts of fraud and conspiracy against the United States.

Since that time, myriad motions—including motions to dismiss the indictment, motions for bills

of particulars, and discovery disputes—have piled up on the docket.  Today the Court considers

four of those motions: Defendant Milton Boutte's Motion for Bill of Particulars [Doc. 32],

Defendant Milton Boutte's Motion to Dismiss the Indictment [Doc. 34], Defendant George Lowe's

Motion to Dismiss Untimely Indictment [Doc. 61], and Defendant Arturo Vargas's Motion for Bill

of Particulars [Doc. 69].  For the reasons below, the Court issues this combined order denying all

four motions.

# I.  BACKGROUND

The following synopsis summarizes the relevant allegations in the indictment that the government eventually must prove beyond a reasonable doubt.

As an overarching matter, Defendants were all generally affiliated with the Big Crow Program Office ("BCPO") at Kirtland Air Force Base in Albuquerque, New Mexico, and allegedly committed their crimes in conjunction with their ties to that office.  BCPO functioned as the airborne component of the United States Army's electronic warfare assessment program beginning in 1971.  The Army principally funded BCPO in its early years.  In the late 1990s, however, the Army's funding for and need of BCPO started to dwindle.  BCPO's ever-diminishing assets, money, and utility eventually led it to shut down for good in 2009.

Near the end of BCPO's run—"not later than 2004," claims the indictment—Defendant Milton Boutte, the then-Director of BCPO, allegedly began to engage in illegal activities with others "to obtain money for [BCPO]."  Specifically, the indictment alleges that Boutte "conspired and schemed" with Defendant George Lowe and "other lobbyists, consultants, and contractors" to lobby Congress and other government agencies for money for the benefit of BCPO.  The lobbyists, however—especially Lowe—charged hundreds of thousands of dollars for their work.  How were Boutte and BCPO to pay for these services?

From a legal perspective, Boutte could not use funds appropriated to BCPO by Congress to pay for Lowe's lobbying activities.  For one thing, Congress did not authorize or appropriate funds to BCPO to expend money for lobbying.  *See* U.S. Const. art. I, § 9, cl. 7; 31 U.S.C. § 1341(a)(1)(B) ("An officer or employee of the United States Government . . . may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.").  And in the absence of that express congressional authorization,

18 U.S.C. § 1913—a criminal statute—forbids federal officers and employees from using *any* appropriated money to engage in activities that could be broadly characterized as lobbying. Thus, unless Boutte or somebody else was willing to use his or her private funds to pay Lowe, the options were limited.

According to the government, Boutte and Lowe chose to take the illegal route. In so doing, the two men turned to the 1953 Small Business Act—specifically, § 8(a) of that Act, wherein Congress established the Business Development Program. The § 8(a) Business Development Program authorizes the government to help eligible small businesses get off the ground. As is relevant here, one way the government does that is by awarding eligible small businesses "sole-source contracts"—contracts entered into without engaging in open competition or a competitive process. As a practical matter, this means that on any given project the government will select a § 8(a) small business as its contractor without first making that small business compete with other potential contractors for its services.

The indictment alleges that Boutte and Lowe realized they could misappropriate funds from § 8(a) sole-source contracts to pay for Lowe's lobbying efforts and other unauthorized expenses. But to do so, they needed small businesses. Thus, the two men allegedly further "conspired and schemed" with Defendants Joe Diaz and Arturo Vargas, two small business owners, to "fraudulently obtain and exploit" § 8(a) sole-source contracts for that illegal purpose.

The indictment alleges that Diaz was the first small business owner to lend illegal support by misappropriating a § 8(a) sole-source contract. He owned a controlling interest in a small business known as Miratek Corporation ("Miratek"), and in due time he enrolled Miratek in the § 8(a) Business Development Program. The United States, in turn, eventually awarded a sole-source contract under § 8(a) to Miratek in 2004 to provide various "technical services" to BCPO

("Miratek Contract"). Diaz then allegedly conspired with Boutte and Lowe to fraudulently divert money from the Miratek Contract to pay Lowe's lobbying fees and other unauthorized expenses. According to the indictment, for instance, Diaz falsely represented that Lowe was an employee of Miratek, and the men would then submit invoices claiming false and fictional hours of work for supposed services that Lowe provided. The total amount unlawfully diverted added up to more than $529,000.

The Miratek Contract, however, could not indefinitely support the confederates' supposedly fraudulent scheme. Funding under that contract slowly had been exhausted, and under the terms of § 8(a), Miratek could no longer participate in the Business Development Program after utilizing it for so many years. Thus, to keep the lobbying and allegedly fraudulent payments moving along, Boutte and Diaz sought another small business that could seamlessly fill Miratek's role in the scheme.

Enter Arturo Vargas. Vargas was a Certified Public Accountant doing business as Vargas P.C. He and his company had served as Diaz's and Miratek's accountant for nearly sixteen years. Yet in early 2005, Vargas and Diaz teamed up before the Small Business Administration to take Vargas P.C. in an entirely new direction. Among other things, the two men informed the Small Business Administration that Vargas P.C. was expanding and diversifying into the information technology field. They further informed the administration that as it did so, they hoped to have Miratek—and, by extension, Diaz—serve as Vargas P.C.'s small business mentor. Under the terms of § 8(a), the Small Business Administration allows protégé/mentor relationships. The Small Business Administration agreed to their request.

Leveraging their new protégé/mentor relationship, Vargas and Diaz eventually asked the Small Business Administration in late 2005 for permission to combine their services under a joint

venture called Vartek, LLC ("Vartek") so that they could work together to provide "technical and analytical expertise" to BCPO. Section 8(a) expressly allows such joint ventures in certain circumstances, and Vartek seemingly satisfied the requisite conditions. The Small Business Administration thus approved the joint venture. The government eventually awarded *two* § 8(a) sole-source contracts to Vartek ("Vartek Contract 1" and "Vartek Contract 2," respectively).

Among other allegations in the indictment, Diaz and Vargas then proceeded to falsely represent that Vartek employed Lowe, and the men then submitted fraudulent invoices claiming fictional hours of work for services Lowe supposedly provided. All in all, Diaz and Vargas allegedly misappropriated at least $506,000 in funds from the two contracts to pay Lowe for his lobbying activities and more than $5,800,000 in funds to pay other lobbyists, consultants, and contractors.

Notably, the indictment also outlines at least one instance where Lowe's lobbying efforts on behalf of BCPO over the years actually succeeded. In early 2005, while the Miratek Contract was still in play, Lowe allegedly informed Boutte, Diaz, and their agents that the Alaska Army National Guard agreed to transfer $1,185,000 to BCPO. That large sum eventually came through and was added to the funding under the Miratek Contract. The indictment alleges that Lowe demanded and eventually received most of that transferred money (or equivalent sums) as payment for his services, which effectively rendered BCPO's initial receipt of the funds from the Alaska Army National Guard useless.

## II. PROCEDURAL HISTORY

After a years-long investigation by federal authorities, a grand jury charged Defendants on November 28, 2017, with 46 separate counts:

- Count 1 is against Boutte, Diaz, Vargas, and Lowe for conspiracy to defraud the United States by obtaining payment of false, fictitious, and fraudulent claims in violation of 18 U.S.C. § 286. This count encompasses allegations relating to all three contracts (the Miratek Contract, Vartek Contract 1, and Vartek Contract 2).

- Count 2 is against Boutte, Diaz, Vargas, and Lowe for conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. This count also encompasses allegations relating to all three contracts.

- Counts 3–4 are against Boutte, Diaz, and Vargas for fraud against the United States in violation of 18 U.S.C. § 1031 and for aiding and abetting in violation of 18 U.S.C. § 2. These counts specifically encompass allegations relating to Vartek Contracts 1 and 2, respectively.

- Counts 5–9 are against Boutte, Diaz, and Lowe for making false, fraudulent, or fictitious claims against the United States in violation of 18 U.S.C. § 287 and for aiding and abetting in violation of 18 U.S.C. § 2. These counts specifically refer to the false invoices these Defendants allegedly submitted in relation to the Miratek Contract.

- Counts 10–22 are against Boutte, Diaz, Vargas, and Lowe for making false, fraudulent, or fictitious claims against the United States in violation of 18 U.S.C. § 287 and for aiding and abetting in violation of 18 U.S.C. § 2. These counts specifically refer to the false invoices these Defendants allegedly submitted in relation to Vartek Contract 1.

- Counts 23–24 are against Boutte, Diaz, and Vargas for making false, fraudulent, or fictitious claims against the United States in violation of 18 U.S.C. § 287 and for aiding and abetting in violation of 18 U.S.C. § 2. These counts also specifically refer to the false invoices these Defendants allegedly submitted in relation to Vartek Contract 1.

- Counts 25–46 are against Boutte, Diaz, and Vargas for making false, fraudulent, or fictitious claims against the United States in violation of 18 U.S.C. § 287 and for aiding and abetting in violation of 18 U.S.C. § 2. These counts specifically refer to the false invoices these Defendants allegedly submitted in relation to Vartek Contract 2.

- The United States also seeks forfeiture against all four Defendants under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) for "any property, real or personal, which constitutes or is derived from proceeds traceable" to their crime of conspiracy to commit wire fraud (Count 2) if they are, in fact, convicted of that offense.

In early January 2018, Boutte filed a Motion for Bill of Particulars [Doc. 32] and Motion to Dismiss the Indictment [Doc. 34]. Vargas later joined both of those motions.[1] Two months later in March, Lowe filed a Motion to Dismiss Untimely Indictment [Doc. 61]. Both Vargas *and* Boutte later joined that motion.[2] Finally, in March 2017, Vargas also filed a Motion for Bill of Particulars [Doc. 69]. No other Defendants joined that motion.

### III. MOTIONS TO DISMISS THE INDICTMENT

### A. Defendant Milton Boutte's Motion to Dismiss the Indictment [Doc. 34]

Boutte first asks the Court to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii), which grants a court the power to dismiss an indictment if it lacks

---

[1] In Vargas's Notice of Joinder to Defendants' Motions [Doc. 64], he states that he is joining the motions labeled on the docket as "Docs. 32, 32, . . . [and] 61." The Court believes that Vargas accidentally typed "32" twice and instead intended for the second "32" to be "34"— Boutte's Motion to Dismiss the Indictment. The Court thus interprets this notice as indicating that Vargas joins Boutte's Motion to Dismiss.

[2] Both Boutte and Vargas filed only *notices* that they were joining other Defendants' motions, but they were technically required to file *motions* asking for permission to do so. *See* D.N.M.LR-Cr. 47.6 ("A co-defendant who seeks to join a specific motion previously filed by a co-defendant must file a motion."). In any event, the Court would have granted these motions to join, so the Court will treat these notices as if they were motions that had been granted.

specificity. He also asks the Court to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which grants a court the power to dismiss an indictment for failure to state an offense. The Court will turn to each of these arguments and their respective sub-arguments in turn. But first the Court will outline the relevant law regarding motions to dismiss an indictment.

     *1.     Applicable Law*

A criminal defendant enjoys the constitutional right "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. The Federal Rules of Criminal Procedure protects this right by requiring the government to obtain an indictment against a defendant that contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Notably, an indictment meets this standard "if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)) (internal quotation marks omitted). If those three standards are met, then the indictment "need not go further and allege in detail the factual proof that will be relied upon to support the charges." *United States v. Doe*, 572 F.3d 1162, 1173–74 (10th Cir. 2009) (quoting *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008)) (internal quotation marks omitted). The indictment, in fact, really need only "quote[] the language of a statute and include[] the date, place, and nature of illegal activity." *Id.* (quoting *Redcorn*, 528 F.3d at 733). The Tenth Circuit in *Dashney* summed up this area of law with a simple statement: "An indictment need only meet *minimal* constitutional standards, and we determine the sufficiency of an indictment by *practical* rather than technical considerations." 117 F.3d at 1205 (emphases added).

If, however, a criminal defendant believes that the indictment is flawed in some way, he may file a motion under Federal Rule of Criminal Procedure 12(b)(3)(B) claiming a defect in the indictment. Any such motion must be made pretrial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Accordingly, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.) (emphasis in original).

Potential defects in an indictment include a lack of specificity and a failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). A motion challenging an indictment on one of these bases—a challenge that requires a court to determine "whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence," *Pope*, 613 F.3d at 1260 (quoting *Todd*, 446 F.3d at 1068) (internal quotation marks omitted)—does not "require a *trial* because it focuses solely on the facts alleged in the indictment and their *legal* adequacy." *Id.* (emphases in original). Thus, although such a motion "can be fairly said to implicate" the merits of the case, it may nonetheless be ruled on before trial commences. *Id.*

And to that end, "a court generally is bound by the factual allegations contained within the four corners of the indictment" when ruling on a pretrial motion claiming a defect in an indictment for lack of specificity and failure to state an offense. *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003). Although in "rare exception[s]" a court can *potentially* "resort to facts outside the indictment" that bear on the merits of the case, this "extra-indictment evidence . . . must be undisputed in the sense that it is *agreed* to by the parties." *Pope*, 613 F.3d at 1260–61 (quoting *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994)) (internal quotation marks omitted). In

other words, if either party "expresse[s] any objection to its consideration or any objection to its completeness and accuracy," a court is constrained to the allegations in the indictment. *Id.* at 1261; *see also id.* at 1259–60 ("[U]nlike their civil counterparts, criminal proceedings have no extensive discovery and summary judgment procedures requiring both sides to lay their evidentiary cards on the table before trial.").

2. *Lack of Specificity under Fed. R. Crim. P. 12(b)(3)(B)(iii)*

Boutte's first and foremost argument in his Motion to Dismiss is that the indictment, while "contain[ing] several detailed, alleged acts and specific involvement and knowledge of the alleged scheme and conspiracy by other named defendants," is "notably and completely devoid of any specific acts, involvement, or knowledge by Mr. Boutte of such [an] alleged scheme or conspiracy." Boutte, in other words, takes issue with the fact the indictment contains noticeably fewer factual allegations against him than it does the other Defendants.

Because this argument concerns whether the allegations in the indictment are sufficient, the Court considers only the allegations contained within the four corners of the indictment.[3] And after considering those allegations, the Court concludes that Defendant's argument must fail. Each count in the indictment sets forth the elements of the offense charged, puts Boutte on fair notice of the charges against which he must defend, and enables Boutte to assert a double jeopardy offense if he had been charged with the same offense previously. This passes constitutional muster, and, as such, the government was not required to go further and allege the detailed factual

---

[3] Boutte attaches dozens of pages of evidence to his Motion to Dismiss that he asks the Court to consider for many of the various arguments he makes. He likewise submitted two Notices of Supplemental Authority, both of which also contain significant amounts of extra-indictment evidence. The government, however, objects to the Court's consideration of this extrinsic evidence. Thus, even if this were the "rare exception" where the Court could feasibly consider this extrinsic evidence, the government's objection to it would still nonetheless constrain the Court to the four corners of the indictment. *See Pope*, 613 F.3d at 1260–61.

proof that it hopes to use to convict Boutte of the charges. The Court will go through each count in turn.

         a.     <u>Count 1</u>

Count 1 alleges that Boutte and his three co-defendants conspired to defraud the government in violation of 18 U.S.C. § 286. The language of § 286 relays the following:

> Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

The Count 1 allegations against Boutte and his confederates, in turn, alleges the following:

> Beginning on a date unknown but not later than October 2004, and continuing through on or about February 2009, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants **MILTON BOUTTE, JOE DIAZ, ARTURO VARGAS,** and **GEORGE LOWE,** and other persons known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, agreed and acted interdependently with each other to defraud the United States by obtaining payment of false, fictitious and fraudulent claims.
> . . . .
> In violation of 18 U.S.C. § 286.

Count 1 continues by summarizing this alleged scheme over the course of approximately five pages and, even more, incorporates all of the prior General Allegations of the Indictment.

Paragraphs 3 and 4 of those allegations are particularly salient:

> **3.** Beginning at a time unknown, but not later than 2004, **MILTON BOUTTE,** then the Director of the Big Crow Program Office, conspired and schemed with **GEORGE LOWE** and other lobbyists, consultants, contractors and others to obtain money for the Big Crow Program Office from Congress and other government agencies. Those lobbyists, consultants and contractors charged hundreds of thousands of dollars for lobbying on behalf of the Big Crow Program Office. The Big Crow Program Office did not have funding nor authorization to expend money for lobbying activities.
> **4. BOUTTE** and **LOWE** conspired and schemed with **JOE DIAZ** and, later, **ARTURO VARGAS** to fraudulently misappropriate and divert federal funds for lobbying services and other unauthorized expenditures. As part of that scheme and conspiracy to defraud the United States, **BOUTTE, DIAZ, LOWE** and others

combined to fraudulently obtain and exploit sole-source contracts awarded without open competition under the § 8(a) Business Development Program to Miratek Corporation (one of **DIAZ's** businesses) and Vartek, LLC (purportedly a joint venture between **DIAZ** and **VARGAS).**

The language from Count 1 and the allegations it incorporates quite clearly track the statutory language of § 286. They also contain the date, place, and nature of the illegal activity. Count 1 thus sets forth the elements of § 286, informs Boutte that he must defend against a charge under § 286 for conspiracy to defraud the United States, and allows him to assert a double jeopardy defense if he had previously been charged with this same crime under § 286. The Court therefore denies Boutte's Motion to Dismiss the Indictment based on lack of specificity under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) insofar as it relates to Count 1.

  b.   Count 2

Count 2 alleges that Boutte and his co-defendants conspired to commit wire fraud in violation of 18 U.S.C. § 1349. Section 1349 states:

> Any person who attempts or conspires to commit any offense under this chapter [Chapter 63] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The Court thus must also look to the language of the actual offense of wire fraud—an offense under Chapter 63 outlined in 18 U.S.C. § 1343. Section 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

And then the Court must consider whether the language of Count 2 matches the language from these statutes. Count 2 alleges:

> Beginning on a date unknown but not later than October 2004, and continuing through on or about February 2009, in Bernalillo County, in the District

of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants, **MILTON BOUTTE, JOE DIAZ, ARTURO VARGAS, GEORGE LOWE** and other persons known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, agreed and acted interdependently with each other to commit an offense under 18 U.S.C. § 1343, that is, to transmit or cause transmission by means of wire communications in interstate commerce of certain writings, signs, signals and sounds for purposes of executing a scheme to defraud the United States and to obtain money from the United States by means of false and fraudulent pretenses and representations as described in the General Allegations.

As part of and in furtherance of the conspiracy, one or more of the conspirators transmitted, and caused to be transmitted, certain writings, signs, signals and pictures by means of wire communication in interstate commerce including: telephone voice communications; transmissions of facsimiles; email and internet communications; submissions and certifications in the CCR and ORCA database; transmissions over the Wide Area Work Flow (WASF) electronic payment system; and transfers of funds over the interstate wire.

In violation of 18 U.S.C. § 1349.

Count 2 also incorporates the General Allegations of the indictment.

Count 2 and its incorporated allegations track the statutory language of § 1343 and § 1349. They also outline the date, place, and nature of the illegal conduct. Count 2 thus sets forth the elements of § 1349, informs Boutte that he must defend against a charge under § 1349 for conspiracy to commit wire fraud, and allows him to assert a double jeopardy defense if he had previously been charged with this same crime under § 1349. The Court therefore denies Boutte's Motion to Dismiss the Indictment based on lack of specificity under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) insofar as it relates to Count 2.

c.   Counts 3–4

Counts 3 and 4 charge Boutte, Diaz, and Vargas with committing major frauds against the United States in violation of 18 U.S.C. §§ 1031 and 2.[4]   In pertinent part, § 1031 forbids the following:

---

[4] Section 2 of Title 18 is entitled "Principals" and states the following:
**(a)** Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

> **(1)** to defraud the United States; or
>
> **(2)** to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program, an economic stimulus, recovery or rescue plan provided by the Government, or the Government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008, or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

Turning to Count 3, it specifically contemplates Vartek Contract 1 and alleges the following:

> From on or about December 2005 to February 2007, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants, **MILTON BOUTTE, JOE DIAZ,** and **ARTURO VARGAS** executed a scheme and artifice to defraud the United States and to obtain money or property by means of false and fraudulent pretenses, representations and promises in connection with [Vartek Contract 1] awarded by the United States Army Contracting Agency, to Vartek, LLC. That contract had been set aside for a disadvantaged small business and was awarded to Vartek, LLC, under the § 8(a) Business Development Program without open competition. The value of [Vartek Contract 2] was $1,000,000 and more.
> . . . .
> All in violation of 18 U.S.C. §§ 1031 and 2.

Count 4 uses similar language regarding Vartek Contract 2:

---

> **(b)** Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

In short, § 2 accordingly "abolishes the common-law distinction between principal and accessory." *United States v. Cook*, 745 F.2d 1311, 1315 (10th Cir. 1984). Thus, to the extent that Boutte takes issue with the fact that the indictment does not indicate which Defendants were participants or principals in the alleged fraudulent acts and which Defendants were aiders and abettors, the difference is inapposite. *See id.* ("[I]t has long been held in this circuit and others that even though an individual is indicted solely for the substantive offense, he/she may be convicted as an aider and abettor even if not charged as such in the indictment.").

From on or about March 2007 to October 2008, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants, **MILTON BOUTTE, JOE DIAZ** and **ARTURO VARGAS** executed a scheme to defraud the United States and to obtain money or property by means of false and fraudulent pretenses, representations and promises in connection with [Vartek Contract 2] awarded by the United States Army Contracting Agency, to Vartek, LLC. That contract had been set aside for a disadvantaged small business and was awarded to Vartek, LLC, under the§ 8(a) Business Development Program without open competition. The value of [Vartek Contract 2] was $1,000,000 and more.
. . . .
All in violation of 18 U.S.C. §§ 1031 and 2.

Like Count 1, Counts 3 and 4 also summarize these frauds over the course of several pages and incorporate the General Allegations of the Indictment.

Counts 3, 4, and their incorporated allegations track the statutory language of § 1031. They also outline the date, place, and nature of the illegal conduct. Counts 3 and 4 thus set forth the elements of § 1031, inform Boutte that he must defend against two charges under § 1031 for major fraud against the United States, and allow him to assert a double jeopardy defense if he had previously been charged with these same crimes under § 1031. The Court therefore denies Boutte's Motion to Dismiss the Indictment based on lack of specificity under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) insofar as it relates to Counts 3 and 4.

        d.      <u>Counts 5–46</u>

Counts 5–46 charge Boutte, Diaz, Vargas, and Lowe with making false, fraudulent, or fictitious claims against the United States in violation of 18 U.S.C. §§ 287 and 2. Section 287 outlaws the following activity:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

The indictment then collectively alleges the following for counts 5–9:

On or about the dates specified below as to Counts 5 through 9 respectively, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants identified in each count made and presented to the United States Department of Interior, a claim upon and against the United States, that is, invoices for technical consulting services purportedly provided under [the Miratek Contract], knowing that each invoice contained false, fictitious and fraudulent claims in that: the invoices were submitted under the pretenses that lobbyists, consultants, contractors and others were employed by Miratek Corporation and provided technical consulting services for program management, strategic planning and analytical support services under the contract; the invoices falsely represented that lobbyists, consultants[,] contractors and other purported employees were Project Managers and billed for their labor at the rate authorized in the contract for Project Managers; the invoices contained false and fictitious claims for hours of labor purportedly performed under the Time and Materials contract.

Counts 10–24 collectively use similar language for Vartek Contract 1:

On or about the dates specified below as to Counts 10 through 24 respectively, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants identified in each count made and presented to the United States Army Contracting Agency a claim upon and against the United States, that is, invoices for technical consulting services purportedly provided under [Vartek Contract 1], knowing that each invoice contained false, fictitious and fraudulent claims in that: the invoices were submitted under the pretenses that lobbyists, consultants, contractors and others were employed by Vartek, LLC, as part of its technical counseling staff and provided program management, strategic planning and analytical support services under the contract; the invoices falsely represented that lobbyists, consultants[,] contractors and other purported employees were Project Managers and billed for their labor at the rate authorized in the contract for Project Managers; the invoices contained false and fictitious claims for hours of labor purportedly performed under the Time and Materials contract.

And finally, Counts 25–46 collectively state the following regarding Vartek Contract 2:

On or about the dates specified below as to Counts 25 through 46 respectively, in Bernalillo County, in the District of New Mexico, and elsewhere within the jurisdiction of this Court, the defendants identified in each count made and presented to the United States Army Contracting Agency a claim upon and against the United States, that is, invoices for technical services purportedly provided under [Vartek Contract 2], knowing that each invoice contained false, fictitious and fraudulent claims in that: the invoices were submitted under the pretenses that lobbyists, consultants, contractors and others were employed by Vartek, LLC, as part of its technical counseling staff and provided program management, strategic planning and analytical support services under the contract; the invoices falsely

> represented that lobbyists, consultants contractors and other purported employees were Project Managers and billed for their labor at the rate authorized in the contract for Project Managers; the invoices contained false and fictitious claims for hours of labor purportedly performed under the Time and Materials contract.

Notably, the indictment includes tables for Counts 5–46 that outline each specific invoice number, the date of the invoice, and the amount of money that the invoice allegedly fraudulently claimed. Further, Counts 5–46, like all the other Counts that the Court has previously described, incorporate the General Allegations of the indictment.

As can be seen, Counts 5–46 and their incorporated allegations track the statutory language of § 287. They also outline the date, place, and nature of the illegal conduct. Counts 5–46 thus set forth the elements of § 287; inform Boutte that he must defend against multiple charges under § 287 for making false, fraudulent, or fictitious claims against the United States; and allow him to assert a double jeopardy defense if he had previously been charged with these same crimes under § 287. The Court therefore denies Boutte's Motion to Dismiss the Indictment based on lack of specificity under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) insofar as it relates to Counts 5–46.

### e. Interdependence for Conspiracy Allegations

Boutte also makes a distinctive and specialized argument regarding specificity "with respect to the government's conspiracy allegations" that go above and beyond his general claim that the indictment as a whole lacks specificity. Namely, he claims that "the indictment is completely devoid of the alleged interdependence attributable to Mr. Boutte." He then cites *United States v. Wells*, 873 F.3d 1241 (10th Cir. 2017), for the proposition that allegations regarding interdependency are required in an indictment charging conspiracy, and because those allegations are missing, his indictment should be dismissed for any counts that allege conspiracy.

"Interdependence exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Wells*, 873 F.3d 1241, 1255 (10th Cir. 2017) (alteration from original omitted) (quoting *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009)) (internal quotation marks omitted). And to Boutte's point, *Wells* indeed mandates that, "[w]ith regard to interdependence," an indictment should "describe[] the interdependent behavior of the coconspirators." *Id.* (quoting *United States v. Bedford*, 536 F.3d 1148, 1156 (10th Cir. 2008)) (internal quotation marks omitted).

Even so, the Court reiterates that it "determine[s] the sufficiency of an indictment by practical rather than technical considerations." *Dashney*, 117 F.3d at 1205. With that in mind, the indictment clearly describes the interdependent behavior of Boutte and the other Defendants. Granted, the word "interdependent" is not used, but Paragraph 3 of the General Allegations (among other allegations listed throughout the rest of the indictment) states that Boutte "conspired and schemed with [Lowe] and other lobbyists, consultants, contractors and others to obtain money for the Big Crow Program Office from Congress and other government agencies." It then alleges that "[t]hose lobbyists, consultants and contractors charged hundreds of thousands of dollars for lobbying on behalf of the Big Crow Program Office." Paragraph 4 of the indictment then brings Diaz and Vargas into the mix and claims that the four men conspired together to "fraudulently misappropriate and divert federal funds for lobbying services and other unauthorized expenditures" by "fraudulently obtain[ing] and exploit[ing] sole-source contracts awarded . . . to Miratek Corporation (one of [Diaz's] businesses) . . . and Vartek, LLC (purportedly a joint venture between [Diaz] and [Vargas])."

Notwithstanding the other allegations listed throughout the 46-page indictment, these two paragraphs alone sufficiently describe the interdependent behavior of the co-conspirators. They

show that the four men intended to act together to misappropriate sole-source contracts for the benefit of BCPO and its lobbyists in a way that benefited each one of the men. That is, Boutte benefited from the lobbying on behalf of BCPO because he was BCPO's Director; Lowe benefited from the money paid to him for his lobbying efforts; and Diaz and Vargas benefited from the day-to-day use of their businesses to perpetuate this alleged years-long scheme. Thus, the indictment adequately alleges interdependence, and the Court denies Boutte's Motion to Dismiss the Indictment based on lack of specificity under Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) insofar as it relates to the conspiracy counts.

   2.   *Failure to State an Offense under Fed. R. Crim. P. 12(b)(3)(B)(v)*

Boutte also argues that the Court should dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense. He makes several distinct sub-arguments in support, and the Court will proceed through each in turn.

   a.   Alaska Army National Guard

Boutte argues that "the only instance of 'lobbying' specified in the indictment is the alleged fund transfer from the Alaska Army National Guard to the BCPO." He then argues, citing a case from the Southern District of Iowa, that 18 U.S.C. § 1913 "applies only to federal departments or agencies and officers or employees thereof." *Grassley v. Legal Servs. Corp.*, 535 F. Supp. 818, 825 (S.D. Iowa 1982). Accordingly, he argues that "because the Alaska Army National Guard is not a Federal entity unless ordered to Active Federal ('Title 10') Status," the "indictment is completely devoid in naming a federal entity or officer who was allegedly 'lobbied' for the Alaskan funds." He thus asks the Court to dismiss Counts 1 and 5–9 for failure to state an offense.

This argument is without merit for several reasons. First, given that the government satisfied its minimal constitutional obligation when crafting each count in the indictment, *see*

*supra*, the allegations regarding the funds transferred from the Alaska Army National Guard have no bearing on whether the indictment is sufficient as a matter of law. In that sense, they're merely additional details that the government was not required to provide.

Second, Boutte's Iowa case from 1982 stood for the proposition that only federal departments, agencies, officers, or employees can *violate* § 1913; it does *not* say that a violation of § 1913 is predicated on whether a federal entity *is lobbied*. *See Grassley*, 535 F. Supp. at 825 n.6. In fact, § 1913 expressly forbids using appropriated money to lobby "a Member of Congress, a jurisdiction, or an official of *any* government," which by its text extends to a state government and its entities such as the Alaska Army National Guard. 18 U.S.C. § 1913 (emphasis added). Along these same lines, even assuming that *Grassley* is correct that only federal entities can violate § 1913—a big assumption given the changing language of § 1913 over the almost 40 years since that case was decided—Boutte does not argue that BCPO is not a federal department or agency or that he himself as Director of BCPO was not an officer or employee of a federal department or agency.

Third, even assuming that Boutte is correct that only federal entities can be lobbied under § 1913, the indictment does not indicate *who* Lowe and others lobbied to secure the funds from the Alaska Army National Guard. For example, if Lowe had lobbied an Alaskan Senator or Representative to obtain the funds, § 1913 would still preclude that action even under Boutte's interpretation of that statute.

Fourth and finally—and perhaps most importantly—none of the 46 counts in the indictment charge Boutte or the other Defendants with directly violating § 1913. Instead, as the Court described above, the indictment charged violations of 18 U.S.C. §§ 286, 1349, 1031, and 287. Thus, even generously assuming that allegations in the indictment do not meet the

requirements of § 1913, the fact that the grand jury did not bring charges under that statute could potentially cure any problems such a deficiency would pose.

Thus, the Court denies Boutte's invitation to dismiss Counts 1 and 5–9 for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) insofar as it relates to Boutte's arguments about the Alaska Army National Guard.

b.   The Small Business Administration's Approval and Boutte's Lack of Cognizance over the Matters Alleged

Boutte notes that the Small Business Administration "is the agency tasked by statute in determining whether a [small] business meets its regulations [under the Business Development Program]." He further observes that the Small Business Administration never determined—or at least the indictment never alleges that it determined—that any of the small businesses and contracts at play in this case were shams or otherwise invalid. Thus, because the Small Business Administration did not "question the validity" of the contracts awarded to Miratek or Vartek, Boutte argues that, "as a matter of law," he had no reason to either. This is especially true given that he "was neither a member of the [Small Business Administration] nor a Contracting Officer [who had authority to enter into and administer federal contracts]." Boutte contends that these two reasons—namely, that the Small Business Administration took no issue with any of the small businesses and contracts at issue, and that in any event he had no authority over these small businesses and contracts—make the indictment "completely deficient," and he invites the Court to dismiss the indictment for failing to state an offense against him.

These arguments must fail at this stage in the proceedings for at least two reasons. The first is that, from what the Court can make of his arguments, Boutte seems to be arguing for a variant of the "government knowledge inference" without explicitly identifying it by name, and utilizing such an inference—at least at this point—is improper. "This inference arises when the

21

government knows and approves of the facts underlying an allegedly false claim prior to presentment," and it "helps distinguish . . . between the submission of a false claim and the *knowing* submission of a false claim—that is, between the presence and absence of scienter." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951–52 (10th Cir. 2008). "A classic example is when the government, with knowledge of the facts underlying an allegedly false claim, authorizes the contractor to make that claim." *Id.* at 952. Applying this doctrine to the allegations in the present indictment, Boutte is thus claiming—as described in his arguments above—that he cannot be guilty of crimes involving fraud relating to the Miratek and Vartek businesses and contracts because the *government itself* knew and approved of those businesses and contracts.

As the language of the above case law implies, the government knowledge inference generally applies in False Claims Act cases, which are civil proceedings. *See, e.g.*, *Burlbaw*, 548 F.3d at 951 (observing that the government knowledge inference applies "in [False Claims Act] cases"). But even assuming that this inference or a similar doctrine could apply outside the False Claims Act in the criminal realm—an assumption upon which the Court passes no judgment—it would not presently save Boutte from facing a criminal prosecution. For one thing, the government knowledge inference only saves defendants when the government has *all* of the information underlying the allegedly false or fraudulent claims and thus "has not been deceived" or defrauded. *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, NO. CIV 05-279 WJ/WDS, 2011 WL 13115254, at *6 (D.N.M. Dec. 7, 2011). The present indictment, however, alleges that the government *did not* have all of the information regarding Miratek, Vartek, and their respective contracts. More specifically, the indictment alleges that Boutte and the other Defendants did not divulge to the Small Business Administration that the sole-source contracts would be used to fund

allegedly illegal lobbying activities. Thus, as far as the government knowledge inference is concerned, it does not support the granting of a pretrial motion to dismiss.

And along those same lines, the government knowledge inference—again, if it can even be applied in a criminal case—is more akin to an affirmative defense that could save a defendant at trial instead of a legal deficiency that mandates dismissal of an indictment. *See Burlbaw*, 548 F.3d at 952 ("[The government knowledge inference] is only an inference. It does not *automatically* preclude a finding of scienter." (emphasis in original)); *Baker*, 2011 WL 13115256, at *6 ("Government knowledge of a false claim can create an inference that the defendant did not act with the requisite scienter. This means that Government knowledge of claims it knows to be false does not automatically bar the Government from bringing these claims, but it can be relevant and useful to determine whether a defendant possessed the requisite scienter element."). Determining whether the Small Business Administration knew all of the relevant facts and whether Boutte intended to defraud the Small Business Administration by using sole-source contracts to fund illegal lobbying activities would implicate "facts surrounding the question of guilt or innocence" that are not contained in the four corners of the indictment. *Pope*, 613 F.3d at 1260. Those inquiries are thus more suited for a trial on the merits than for a pretrial motion to dismiss. *Id.* at 1259–61.

The second reason that Boutte's arguments fail is that, as the government correctly notes, his arguments stem "from a fundamental misconception of the scope of his [alleged] criminal responsibility." Boutte contends that his lack of "cognizance" over the businesses and contracts at issue saves him from criminal liability. And in so doing, he relies on the Eleventh Circuit's reasoning in *United States v. Blankenship* wherein that court noted "the importance, even in the context of federally funded programs, of determining whether or not the federal agency actually

23

has power over the specific transaction in which the false statements were made." 382 F.3d 1110, 1137 (11th Cir. 2004). In Boutte's view, because he had no such power over the businesses that engaged in and the contracts that encompassed the alleged fraudulent conduct at issue, *Blankenship* precludes him from being held accountable for any criminal activity.

Boutte's argument misses the mark. Initially, *Blankenship*—an out-of-circuit, non-binding case in any event—sought to interpret the terms of 18 U.S.C. § 1001, which is a statute not at issue in this case. *Blankenship*, 382 F.3d at 1136–38. But more fundamentally, that Boutte was not a member of the Small Business Administration or a Contracting Officer "who had cognizance over the matter alleged" does *not* mean that he could not engage in a scheme and conspiracy *with others* that intended to defraud the government via sole-source contracts under the § 8(a) Business Development Program. Indeed, as the government aptly argues, Boutte "conflates criminal liability with contractual responsibility and administrative authority" in a way that is "akin to arguing that only bank employees and bank examiners can commit bank fraud." *Blankenship* does not say otherwise, nor could it. Conspiracies and schemes to defraud are not as limited as Boutte suggests. *See, e.g.*, *United States v. Troutman*, 814 F.2d 1428, 1446 (10th Cir. 1987) ("Once a conspiracy is established, only slight evidence is required to connect a co-conspirator . . . and the acts attributable to any member of the conspiracy are attributable to all other members" (citations omitted).); *see also United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) ("[T]he evidence need only show that the defendant played a minor role in the conspiracy to make him a co-conspirator."); *Pinkerton v. United States*, 328 U.S. 640, 647 (1946) ("The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on

the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all.").[5]

The Court thus denies Boutte's invitation to dismiss the indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) on these grounds.

### c.     Regulatory and Administrative Due Process

In Boutte's second Notice of Supplemental Authority, he argues that "each of the regulations and statutes underlying the allegations in the indictment . . . [have] specific regulatory due process that needed to be followed, but wasn't." He then contends that such regulatory due process "was required to make the findings in the indictment" because a November 2017 memorandum by Attorney General Jeff Sessions mandates as much. *See* Memorandum from The Attorney General Regarding "Prohibition on Improper Guidance Documents" (Nov. 16, 2017). Specifically, Boutte observes that the memorandum provides that letters of guidance "may not be used as a substitute for [notice-and-comment] rulemaking and may not be used to impose new requirements on entities outside the Executive Branch." *Id.* at 1. The purpose of that new requirement, he writes, "was to stop the apparent prior practice of issuing opinions that purported to bind the public or third parties without following regulatory due process requirements." And he claims this is exactly what the government did in bringing the indictment: attempt to bind the Defendants via various "statements" and "pronouncements" without following the regulatory due process requirements of the statutes at issue.

---

[5] In his first Notice of Supplemental Authority, Boutte also attempts to use evidence unearthed during discovery to prove that another man at BCPO was the person with legal cognizance over the contracts at issue. To the extent that any of this evidence bears on the ultimate disposition of Boutte's guilt, it is more appropriate for a trial on the merits than for a pretrial motion to dismiss. *Pope*, 613 F.3d at 1259–61. The Court reiterates that courts should only rarely use evidence outside of the four corners of the indictment when ruling on motions to dismiss.

This argument fails. From a fundamental perspective, Boutte's invocation of the Attorney General's memo is simply misguided. Any "statements" and "pronouncements" in the indictment—Boutte does not identify any outright but alludes to supposedly "unreliable and inadmissible hearsay in the form of agent notes"—are not analogous to the guidance documents that the Department of Justice had previously issued until the current Attorney General put a stop to that practice. According to the Attorney General, such guidance documents purportedly intended to "bind private parties without undergoing the [notice-and-comment] rulemaking process" as required by *civil* and *administrative* law. Memorandum at 1. The factual allegations in the criminal indictment, meanwhile, are simply that: factual allegations in a *criminal* indictment. Granted, those allegations do attempt to "bind" the Defendants in the sense that the allegations seek to hold Defendants accountable for suspected criminal conduct. But that is the only notable characteristic that the guidance documents and the allegations in the indictment share. Indeed, the allegations are not attempting to flout the process by which laws and regulations are made in a way that the Attorney General claims that the guidance documents did. Factual allegations (obviously enough) are not laws or regulations, and the very fact that the allegations are *contained in an indictment* shows that the government is following, or at least attempting to follow, the proper legal framework. *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). Boutte's comparison between the two is thus far too flimsy.

But insofar as Boutte is simply claiming that the government was required to satisfy more stringent due process requirements and thus ran afoul of the spirit of the Attorney General's memorandum, his arguments still fail at this point. The only example that Boutte identifies that supposedly fits this pattern is "the allegation that [he] engaged in prohibited lobbying pursuant to

18 U.S.C. § 1913."  In particular, he notes that the government only cites the first half of § 1913 in the indictment—the part that forbids using appropriated funds to conduct lobbying activities— but fails to cite the latter half, which states the following:

> [This section] shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy or appropriations which they deem necessary for the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities.

Boutte claims that the "the complete failure of the indictment to consider the foregoing discretionary elements"—that is, whether the allegations against him stemmed from intelligence and counter-intelligence activities—"renders it defective," presumably because in his view considering these elements was a requirement of regulatory due process.

Boutte cites no authority suggesting that an indictment is required to consider the second half of § 1913 as part of regulatory due process.  He simply asserts it.  Even more, the Court can think of no good reason why the indictment at hand would need to when—as the Court discussed above—*none of the charges in the indictment were brought under § 1913*.  At most, in the specific circumstances of this case the second half of § 1913 could function as a type of defense that, if satisfied, could potentially establish that Boutte did not intend to engage in the *actual* charges against him, such as conspiracy to defraud the government and conspiracy to commit wire fraud, etc.  And to that end, any discussion of the second half of § 1913 is more appropriate during a trial on the merits.  *See Pope*, 613 F.3d at 1261 (holding that an affirmative defense "bearing directly on [the defendant's] guilt or innocence" implicated "the who, what, where, when, why, and how" of the charges against him and thus was more suited for a trial on the general issue of the case).

Finally, insofar as any civil statutes and administrative regulations in the context of government contracts require regulatory due process, the Court notes that any such due process would not influence the validity of criminal charges in an indictment alleging fraud and conspiracies to defraud the United States. The civil and administrative requirements and standards would at most function as evidence at trial that could bear upon the different elements of the crimes at issue. *See Pope*, 613 F.3d at 1261.

The Court thus denies Boutte's invitation to dismiss the indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) on the basis that the government did not follow regulatory due process procedures.

d.    Forfeiture

Finally, Boutte claims that the forfeiture allegation should be dismissed because forfeiture claims are derivative of other covered violations and, because no violations occurred, the forfeiture allegation lacks a legal basis. He also claims that it lacks a factual basis because, in any event, he "did not obtain any money personally."

Because the Court has not dismissed any of the 46 Counts in the indictment, no reasons exist on a legal basis to dismiss the forfeiture allegation. And from a factual perspective, Boutte's claims that he did not receive any money personally and that the Defendants did not take part in any illegal conduct are far more suited to resolution at trial after a fact-finder can evaluate any relevant evidence.

The Court thus denies Boutte's request to dismiss the forfeiture allegation under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense.

### 3. Other Arguments

Boutte argues in his opening brief that "[t]he indictment also curiously seeks to criminalize any use of contract 'consultants,' even though this was fully disclosed" in the Miratek and Vartek Contracts, and he thus claims that "[t]he indictment does not detail in any legally cognizable way[] how the consultants here were not . . . legal at the time." Yet he does not describe or argue how, even if these contract consultants *were* legal, that makes the 46 Counts and remaining allegations in the indictment insufficient and worthy of dismissal. Indeed, as described above, the indictment met its minimal constitutional obligations regardless of whether the Court considers the legality of these consultants.

Similarly, Boutte includes two footnotes in his first Notice of Supplemental Authority arguing that dismissal is warranted because the government has not complied with its discovery obligations. Again, Boutte does not connect the dots with any arguments or authority, and in any event, dismissal of the case under Federal Rule of Criminal Procedure 16(d)(2)(D) would be too harsh at this time.

### 4. Vargas's Joinder

As noted above, Defendant Arturo Vargas eventually joined Boutte's Motion to Dismiss the Indictment. Vargas, however, makes no independent arguments on his own in support of Boutte's motion or otherwise outlines how Boutte's arguments should apply to him. Thus, the Court likewise denies Boutte's motion insofar as it pertains to Vargas for the same reasons outlined above.

### 5. Conclusion

All in all, the Court denies Defendant Milton Boutte's Motion to Dismiss the Indictment [Doc. 34] for the reasons stated above.

**C.    Defendant George Lowe's Motion to Dismiss Untimely Indictment [Doc. 61]**

Defendant George Lowe uses a different tactic in his Motion to Dismiss.   Instead of claiming that the indictment lacks specificity or fails to state an offense, he argues that the indictment is untimely under Federal Rule of Criminal Procedure 12(b)(3)(A)(ii).

*1.  Statute of Limitations*

As a general rule, the United States must prosecute acts of fraud against the government "within five years . . . after such offense shall have been committed" except "as otherwise expressly provided by law."  18 U.S.C. § 3282(a).  This five-year period applies to the charges alleged in Counts 1–2 and 5–46 of the indictment.  Counts 3 and 4 for major fraud against the United States, meanwhile, are an exception to this general rule and are subject to an increased seven-year statute of limitations period.  18 U.S.C. § 1031(f).

For *all* counts in the indictment, however, 18 U.S.C. § 3287 expands their statutes of limitations during times of "war" as that term is broadly defined:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations applicable to any offense . . . involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not . . . shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

In short, § 3287 thus tolls the five-year statute of limitations for fraud claims (or the seven-year statute of limitations period for crimes under § 1031 if they involve fraud against the United States) until the end of the war or the end of the authorized use of the Armed Forces.  The government then has five years from the date of the end of hostilities to commence prosecution.

Notably, in 2001 Congress authorized the use of Armed Forces in response to the September 11 terrorist attacks.  *See* Authorization for Use of Military Force, Pub. L. No. 107–40,

115 Stat. 224 (2001).  As of today, that congressional authorization is still valid and has not been repealed.  *Cf. United States v. Arnold*, 991 F. Supp. 2d 1307, 1316 (S.D. Ga. 2014) ("After great consideration, the Court holds that there has been neither a presidential proclamation of the termination of hostilities in Afghanistan, nor a concurrent resolution of Congress.").  Thus, insofar as the indictment alleges that any of the 46 Counts occurred after 2001, the express terms of § 3287 would apply to toll the statutes of limitations generally applicable to these crimes because they all involve fraud or a conspiracy to commit fraud against the United States.

And to be sure, each of the 46 Counts *do* allege crimes that took place after 2001.  Count 1 (conspiracy to defraud the United States) positions the crime "[b]eginning on a date unknown but not later than October 2004, and continuing through on or about February 2009."  Count 2 (conspiracy to commit wire fraud) also positions the crime "[b]eginning on a date unknown but not later than October 2004, and continuing through on or about February 2009."  Counts 3 and 4 (major fraud against the United States) allege criminal conduct from December 2005 to February 2007 and March 2007 to October 2008, respectively.  And finally, Counts 5–46 (making false, fraudulent, or fictitious claims against the United States) allege criminal conduct at various points from May 2005 to December 2008.  Section 3287 thus applies to all 46 Counts in the indictment, and the statutes of limitations for these crimes therefore has not yet run.

Lowe, however, notes one potential problem.  He observes that § 3287 only took its current form on October 14, 2008.  Before that day, § 3287 applied only "[w]hen the United States [was] at war"; it did *not* include any language suggesting that it could apply when Congress had authorized the use of the Armed Forces.  *Compare* 18 U.S.C. § 3287 (Supp. I 2007), *with* 18 U.S.C.

§ 3287 (Supp. II 2008).[6]  Indeed, he even cites two cases that held that the prior version of § 3287 applied *only* to formal declarations of war.  *See, e.g.*, *United States v. W. Titanium, Inc.*, Criminal No. 08–CR–4229–JLS, 2010 WL 2650224 (S.D. Cal. July 1, 2010) (unpublished); *United States v. Shelton*, 816 F. Supp. 1132 (W.D. Tex. 1993).  The importance of the distinction between the two lies with the fact that Congress cannot extend a statutes of limitations period when it has already expired without violating the *Ex Post Facto* Clause of the Constitution.  *Stogner v. California*, 539 U.S. 607, 609, 617–18 (2003); *see also* U.S. Const. Art. 1, § 10, cl. 1.  Thus, Lowe suggests that as of the date Congress amended § 3287, Congress could not toll the limitations periods for crimes committed during times where it had authorized the use of military force (as opposed to formally declaring war) insofar as those crimes were committed *more* than five years before October 14, 2008.

To illustrate, consider a crime committed in January 2002.  Because Congress had not formally declared war on any country as of that year and had instead only authorized use of the Armed Forces, Lowe claims that the prior version of § 3287 would not (and could not) have applied.  Thus, the "regular" five-year statute of limitations would apply and would have run in January 2007.  Over a year-and-a-half later in October 2008, then, when Congress amended § 3287 to apply when it authorizes the use of the Armed Forces, the January 2002 crime would still be dead and buried.  Indeed, Congress could not suddenly resurrect it without violating the commands of *Stogner* and the *Ex Post Facto* Clause.

---

[6] The 2008 amendment to § 3287 "also lengthened the suspension period from three to five years and clarified that a presidential proclamation ending hostilities must be a formal proclamation with notice to Congress."  *United States v. W. Titanium, Inc.*, Criminal No. 08–CR–4229–JLS, 2010 WL 2650224, at *2 (S.D. Cal. July 1, 2010) (unpublished).

Lowe applies this logic to the 46 crimes the indictment accuses him of committing. Although he concedes that any allegations of criminal conduct *after* October 14, 2003, would be covered by the amended version of § 3287—*Stogner* explicitly recognized that Congress may extend *unexpired* statutes of limitations periods without running afoul of the Constitution, 539 U.S. at 617–18—he argues that any criminal activity *before* October 2003 would be barred by the general five-year limitations period under § 3282(a).  He thus asks the Court to bar any allegations of criminal activity that occurred before October 2003.

The first problem with Lowe's request is that only Counts 1 and 2 *conceivably* allege conduct that occurred before October 2003; the remaining counts all allege conduct that occurred in 2005 or later.  But even Counts 1 and 2 survive Lowe's argument.  Granted, the language used in those counts pinpoint crimes that began "on a date unknown but not later than October 2004" and thus could conceivably encompass criminal conduct going back further than that.  Even so, Counts 1 and 2 both allege different types of conspiracy—conspiracy to defraud the government and conspiracy to commit wire fraud, respectively—which is a "prototypical continuing offense," *United States v. Lee*, No. 99-3266, 2000 WL 531545, at *1 (10th Cir. May 3, 2000) (unpublished), by which the crime "is not complete upon the first act, but instead continues to be perpetuated over time," *United States v. Reitmeyer*, 356 F.3d 1313, 1321 (10th Cir. 2004) (quoting *United States v. De La Mata*, 266 F.3d 1275, 1288 (11th Cir. 2001)) (internal quotation marks omitted). Accordingly, for conspiracies that do not require an overt act (like a conspiracy to defraud the government under § 286 and a conspiracy to commit wire fraud under § 1349), this means that "for statute-of-limitations purposes, . . . [the] conspiracy is not committed simply on the date the agreement is made but is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated." *United*

*States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir. 2005) (quoting *United States v. Arnold*, 117 F.3d 1308, 1313 (11th Cir. 1997)) (internal quotation marks omitted); *see also United States v. Dedman*, 527 F.3d 577, 594 n.7 (6th Cir. 2008) ("The government does not need to prove an overt act under 18 U.S.C. § 286."); *United States v. Thornburgh*, 645 F.3d 1197, 1204 (10th Cir. 2011) (observing that conspiracies to commit wire fraud under 18 U.S.C. § 1349 do not require proof of an overt act). And because the indictment alleges that the conspiracies in Counts 1 and 2 took place up until February 2009, § 3287 thus quite obviously tolls the statutes of limitations for those crimes.[7]

All in all, then, each of the 46 Counts in the indictment allege criminal activity that falls under the gambit of § 3287. The statutes of limitations for those crimes were all therefore tolled, and the November 28, 2017 indictment is thus timely. The Court denies Lowe's invitation to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(ii) insofar as it concerns the statute of limitations periods for the crimes at issue.[8]

### 2. Due Process under the Fifth Amendment

Notwithstanding the fact that the indictment falls within the applicable statute of limitations, Lowe maintains that the indictment is untimely based on another provision: the Fifth Amendment Due Process Clause. Indeed, the Supreme Court has noted that although "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide

---

[7] Lowe admits as much in his Motion to Dismiss when he states that § 3287 "as amended would apply to toll the statute of limitations" for any crimes that "occurred post July 2003, including [the] 'continuing crimes' of conspiracy in Counts 1–2."

[8] In his reply brief, Lowe drops a footnote stating that he "will also be filing a facial constitutional challenge" to § 3287 as amended because that section essentially grants the government "an endless period in which to investigate" and bring fraud charges against a defendant "as long as the United States remains involved in 'hostilities' short of war." To date, however, Lowe has filed no such challenge.

the primary guarantee[] against bringing overly stale criminal charges," the "Due Process Clause has a limited role to play in protecting against oppressive delay," as well. *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (internal quotation marks omitted). With that lesson in mind, Lowe maintains that the government violated his Fifth Amendment Due Process rights by not filing an indictment until November 28, 2017, even though the charges allege conduct that ended in 2009. To Lowe, this eight-year delay is inexcusable, especially because he argues that the government knew about the alleged criminal conduct as early as April 2010.

"[O]ppressive pre-indictment delay" warrants dismissal under the Fifth Amendment Due Process Clause only when a defendant can show (1) "actual prejudice" to his or her right to a fair trial and (2) that the delay "was purposefully designed to gain tactical advantage or to harass the defendant[]." *United States v. Jenkins*, 701 F.2d 850, 854 (10th Cir. 1983) (quoting *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978)), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986); *see also United States v. Marion*, 404 U.S. 307, 324 (1971) (same). The second element of this test can also be satisfied if the prosecutorial delay is "incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco*, 431 U.S. at 795 n.17. Further, "[t]he burden of proof of making this showing is on the defendant. Accordingly, a defendant must meet this two-pronged test." *United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992) (citation omitted).

Lowe argues that he suffered actual prejudice in three ways. First, he claims that "[t]o substantiate his legitimate and lawful" lobby activities, he would "need to subpoena" certain members of Congress and "select individuals on their staff." Most of these individuals, however, have since passed away or otherwise left office since 2009, and "[w]ith their Congressional offices

closed," Lowe claims "it would be impossible to obtain the documentation that would substantiate" those activities.  Second, Lowe claims that so much time has passed that he is no longer able to "obtain relevant and exculpatory financial documents" that are needed "to do an exact accounting through check and wire transfer tracing" and would purportedly show he received significantly less money—and did so legally—than the government claims he did.  Third and finally (and in a seeming reiteration of his first claim of prejudice), Lowe claims that so many "critical witnesses" have died that he cannot "refute the allegations in the indictment that [the] lobbying was illegal."

The Court grants Lowe the benefit of the doubt and assumes that he can, in fact, show he was actually prejudiced by pre-indictment delay.  Even so, Lowe cannot establish that the government intentionally or recklessly delayed bringing the indictment, nor does he point to any disputed issue of material fact in that regard that would warrant an evidentiary hearing.

Consider the following: even assuming that the government did, in fact, learn about the alleged criminal misconduct by April 2010, the best Lowe can do from that point is claim that the government was "able to bring this case much earlier and closer to the events in time" and had "no apparent reason" to "wait[] some 7–8 years, until November 2017, to bring the instant charges." He then claims that he "intends to show at a hearing that the government delay could not have been occasioned by the need for a 7–8 year investigation, but instead, was for the purpose of benefiting the government."[9]

For one thing, the mere fact that the government waited several years to bring charges is not enough to justify dismissal on due process grounds.  In *United States v. Trammell*, for instance,

---

[9] Lowe mentions in a footnote that he filed a "sealed motion regarding matters pertinent to this motion [to dismiss] and which would be a part of the hearing on this motion."  Without going into detail, the Court has reviewed all of the briefing for the sealed motion and can discern no information or topics that would bear upon the government's reasons for any preindictment delay.

the Tenth Circuit held that the defendant had "completely failed to establish" that the government's three-year-and-nine-month preindictment delay "was an intentional ploy to gain a tactical advantage." 133 F.3d 1343, 1351 (10th Cir. 1998). And in *United States v. Wood*, the Tenth Circuit similarly held that the defendant had not proffered any evidence of intentional delay even though it was undisputed that the government had delayed almost four years before bringing the indictment. 207 F.3d 1222, 1235 (10th Cir. 2000). Granted, the seven-to-eight-year delay in the case at hand is longer than the three-to-four-year delays in *Trammell* and *Wood*. Even so, the Court believes these cases offer strong guidance. Specifically, the Court believes that the longer delay in this case could reasonably stem from the unusual complexity of the criminal allegations in the indictment and the corresponding need to investigate those allegations before bringing the indictment (a belief the Court will expound upon more below). *See Lovasco*, 431 U.S. at 795 ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."). A seven-to-eight-year delay, especially when allowed by the applicable statute of limitations, *see supra*, does not raise any grave concerns in the context of this case.

Moreover, Lowe's bare-bones assertions that he will use an evidentiary hearing to unearth proof of the government's intentional and bad-faith desires to delay the case do not justify an evidentiary hearing. Indeed, "[a]lthough Rule 12 [of the Federal Rules of Criminal Procedure] does not by its terms specify when [a motion alleging a defect in instituting the prosecution] entitles a defendant to a pretrial evidentiary hearing," the defendant's motion must "demonstrate a colorable claim for relief" before a court will grant him one. *United States v. Dietz*, 452 F. Supp. 2d 611, 616 (E.D. Pa. 2006) (internal quotation marks omitted). And "[i]n order to be 'colorable,'

a defendant's motion must consist of more than mere bald-faced allegations of misconduct. There must be an issue of fact material to the resolution of the defendant's constitutional claim." *Id.* (citation omitted); *see also United States v. Coleman*, 149 F.3d 674, 678 (7th Cir. 1998) ("Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific and non-conjectural and detailed enough to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion."). "[I]ntend[ing] to show at a hearing" that the government intentionally or recklessly delayed bringing the indictment because it had "no apparent reason" to wait as long as it did is not the type of specific and non-conjectural allegation that warrants further investigation.

On the other hand, the government, unlike Lowe, proffers specific reasons for its delay in bringing the indictment. Specifically, the government notes the complexity of the allegations in the indictment and that "[t]he acquisition and analysis" of the myriad documents in this case "was a time-consuming endeavor." The government also summarizes the thorny labyrinth it had to navigate before it finally convened the grand jury and brought charges:

> [A]lthough analysts began reviewing Vartek's contract in 2010, the focus of the investigation turned to [a separate joint venture entitled Electronic Warfare Associates ("EWA")] in mid-2011, and to [another joint venture entitled] ATAMIR in late 2011 and continuing to 2013. After analysts had completed their review of the records then in their possession regarding the Vartek, EWA and ATAMIR contracts, the Department of Defense Inspector General issued subpoenas in August 2013 to ATA, Miratek and Vargas, P.C. Pursuant to those subpoenas, those corporations produced records, documents and data in October and November 2013. Analysis of those materials took several months and pushed the investigation into 2014.
> The time-consuming review of documents and records enabled investigators to piece together a rough sketch of the Miratek-Vartek scheme. In April 2014, investigators met with Assistant United States Attorneys to present their analysis of the Vartek contract and discuss additional investigative steps. Following that meeting, investigators conducted several additional interviews and conducted

further analyses of contracts. Investigators also continued to examine emails extracted from the Big Crow Program Office's computers.

The United States Attorney's Office opened a file on this investigation in October 2014 and a grand jury subsequently joined in the investigation. Without delving into the details of that investigation, the grand jury subpoenaed documents, summoned witnesses, and received evidence of the complex scheme described in the Indictment. As part of the continuing investigation, agents and analysts also interviewed witnesses, acquired and examined additional records, documents and data, and reexamined documents and data that had previously been collected.

United States' Resp. to Def.'s Mot. to Dismiss the Indictment 21–22. While acknowledging that "[w]ith the benefit of hindsight, one might chart a more direct course through the myriad misconduct and intertwined contracts" at BCPO, the government ultimately maintains that the above sequence of events explains why it did not intentionally or recklessly delay the investigation or indictment.

Lowe nonetheless urges this Court not to blindly accept the government's "summary arguments" and instead reiterates his belief that he is entitled to an evidentiary hearing "to make a record regarding all of these matters." But the Court once again notes that unsupported, conjectural allegations of bad faith on the part of the government do not warrant an evidentiary hearing. No matter how Lowe attempts to argue it, that is the only way he has attempted to refute the government's explanation for the delay. He has not pointed the Court to any direct or concrete evidence of misconduct that would suggest otherwise.

As a final point, Lowe himself undermines his own argument. In a footnote in his reply brief, he states the following:

Rather than a clear and focused strategy by governmental investigators to work efficiently and diligently to untie a massively complex Gordian knot of intertwined contracts, this appears to be the standard "good enough for government work, we will get to it tomorrow" scenario, which the endless potential Statute of Limitations under the amendment to [18 U.S.C. § 3287] allows and even encourages. Anyone familiar with the government and the military, reading through the lines, would realize that this was instead an uncoordinated investigation between multiple agencies, military and Department of Justice, that simply did not communicate and

coordinate in a timely fashion, leading to a 7 year delay from government knowledge to indictment.

As this footnote acknowledges, if Lowe is correct and this truly *was* "an uncoordinated investigation between multiple agencies . . . that simply did not communicate and coordinate in a timely fashion," then Lowe himself recognizes that the government did not intentionally (or even recklessly) delay bringing charges to gain a tactical advantage.

The Court thus denies Lowe's invitation to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(ii) insofar as it concerns preindictment delay under the Fifth Amendment Due Process Clause.

### 3. *Boutte's and Vargas's Joinder*

As noted above, Defendants Milton Boutte and Arturo Vargas eventually joined Lowe's Motion to Dismiss Untimely Indictment. Although Boutte submitted several pages of argument in addition to his notice of joinder, he, like Lowe, does not point to any evidence suggesting the government intentionally delayed bringing the indictment to gain a tactical advantage, nor can he establish a genuine issue of material fact in that regard. Vargas, meanwhile, submitted no additional arguments and merely joined the arguments that Lowe made. The Court accordingly denies Lowe's motion insofar as it pertains to Boutte and Vargas for the same reasons outlined above.

### 4. *Conclusion*

All in all, the Court denies Defendant George Lowe's Motion to Dismiss the Indictment [Doc. 61] for the reasons stated above.

## IV.    MOTIONS FOR BILLS OF PARTICULARS

**A.    Defendant Milton Boutte's Motion for Bill of Particulars [Doc. 32]**

*1.    Boutte's Motion*

Federal Rule of Criminal Procedure 7(c)(1) requires the government to obtain an indictment against a defendant that contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  As discussed above, if a defendant does not believe the government has met its obligation to do so, one option he has is to file a motion to dismiss the indictment under Rule 12(b)(3).  But that is not the *only* option a defendant has.

Indeed, in lieu of a motion to dismiss, Federal Rule of Criminal Procedure 7(f) allows a defendant to move for, and the Court to direct the government to file, a bill of particulars.  At its most simple, a bill of particulars simply provides a defendant with "more definite information about the charges against him."  *United States v. Elliott*, No. 2:14-cr-03822 RB, 2015 WL 13667416, at *3 (D.N.M. Sept. 21, 2015).  More specifically, its purpose "is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (quoting *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985)) (internal quotation marks omitted).  And in that sense, a bill of particulars is primarily a mechanism to sharpen an indictment so that it can meet the requirements of Rule 7(c)(1).  *Cf. Todd*, 446 F.3d at 1067 (noting that an indictment is sufficient "if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense").

In addition to filing his Motion to Dismiss, Boutte thus also filed a Motion for a Bill of Particulars. In so doing, he once again claims that the indictment "is notably and completely devoid of any specific acts, involvement, or knowledge by Mr. Boutte of such [an] alleged scheme or conspiracy" and that he "has been seemingly lumped into the indictment just because he happened to be the Director of BCPO during the relevant time period." He therefore argues that he is "completely unaware of what specific allegations are asserted against him" and "is not able to properly defend against any charges in the indictment without the government providing more specific information." He believes a bill of particulars will cure this and accordingly requests the United States to provide myriad additional information, including (but not limited to) "any and all facts and circumstances" related to his criminal liability under each Count and the "names and addresses" of all other people who "in any way participated" in the crimes.

The Court, however, observes that "[i]t is well-established that a bill of particulars is not necessary if the indictment sets forth the elements of the offense charged and sufficiently apprised the defendant of the charges against him." *Elliott*, 2015 WL at 13667416, at *3. Further, a defendant "is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case." *Dunn*, 841 F.2d at 1030 (emphases in original) (internal quotation marks omitted). And to that end, although a bill of particulars may "amplify the indictment by providing additional information," it is specifically "*not* a discovery device." *Id.* at 1029 (emphasis added) (internal quotation marks omitted).

Exercising its "broad discretion" in deciding motions for bills of particulars, *id.*, the Court denies Boutte's request. To start, as the Court outlined in great detail above when ruling on Boutte's Motion to Dismiss, each Count of the indictment is sufficient as to Boutte: each Count specifically outlines the elements of the offenses under which he was charged, puts him on fair

notice of the charges against which he must defend, and enables him to assert a double jeopardy offense. Thus, a bill of particulars is not necessary. But even more, the pages and pages of information that Boutte requests from the government are much more akin to evidence the government intends to produce at trial instead of additional details outlining the government's theory of the case. Boutte's motion, therefore, is simply a veiled discovery device meant to circumvent the discovery procedures outlined in Federal Rule of Criminal Procedure 16. And insofar as Boutte takes issue with the way the government has conducted discovery under Rule 16, he is welcome to file a separate motion claiming as much.

The Court thus denies Boutte's Motion for a Bill of Particulars under Federal Rule of Criminal Procedure 7(f) [Doc. 32].

### 6. *Vargas's Joinder*

As noted above, Defendant Arturo Vargas eventually joined Boutte's Motion for a Bill of Particulars. He failed, however, to submit any additional arguments supporting Boutte's motion. And in any event and as described below, Vargas later filed his own Motion for a Bill of Particulars. The Court accordingly denies Boutte's motion insofar as it pertains to Vargas for the same reasons outlined above.

## B. Defendant Arturo Vargas's Motion for Bill of Particulars [Doc. 69]

Defendant Arturo Vargas also filed a Motion for a Bill of Particulars. Like Boutte, he claims that he "requires specificity as to each allegation asserted against him in order to properly defend against the charges in the indictment." Unlike Boutte, however, Vargas's requests are much narrower and more tailored. Indeed, he requests only three things:

> 1. For Count 1, Mr. Vargas requires facts that allege Mr. Vargas intended to act in a manner to defraud the United States other than his mere association with Vartek, LLC. The request includes specific dates in which Vartek, LLC was used by Mr. Vargas to intentionally commit acts of fraud.

2. For Count 2, the Indictment lacks clarity as to acts Mr. Vargas performed that allegedly resulted in committing wire fraud. Mr. Vargas requires, dates, locations and facts that will sufficiently allow Mr. Vargas to know of the charges against him and prepare for such defense.

3. For Counts 10–48, the Indictment is severely lacking information to sufficiently inform Mr. Vargas of the acts charged against him. Multiple defendants are lumped in together and charged with submitting fraudulent invoices. The charts of allegedly fraudulent invoices filed is insufficient to provide Mr. Vargas with the necessary information to prepare a defense. Mr. Vargas requires information as what acts he allegedly performed with respect to each count. At this point, the indictment each defendant for involvement in each invoice. Mr. Vargas cannot properly defend the allegations without knowing the facts for each Count and how he is charged to have act in a criminal manner with respect to each Count.

Although Vargas's requests are more specific than Boutte's, the Court nonetheless once again exercises its broad discretion to deny his motion. *Dunn*, 841 F.2d at 1029. For one thing, although the Court described the sufficiency of the Counts in the indictment when adjudicating Boutte's Motion to Dismiss, that analysis applies equally to Vargas and his current Motion for a Bill of Particulars. And as stated elsewhere, every Count in the indictment states with sufficient precision the offenses under which each defendant was charged, puts each defendant on fair notice of the charges against which he must defend, and enables each defendant to assert a double jeopardy offense. Thus, like Boutte, a bill of particulars is not necessary for Vargas. Further, even though Vargas's requests appear more reasonable and manageable than Boutte's, he is still requesting information that bears more on the evidence in the government's possession than on its theory or theories of the case. As a final point, and although not strictly necessary, the General Allegations in the indictment that were incorporated into each Count contain fairly specific factual details about Vargas's involvement in the alleged criminal conduct.

The Court thus denies Vargas's Motion for a Bill of Particulars under Federal Rule of Criminal Procedure 7(f) [Doc. 69].

## V.    CONCLUSION

For the reasons set forth above, the Court:

1. **DENIES** Defendant Milton Boutte's Motion for Bill of Particulars [Doc. 32];

2. **DENIES** Defendant[] Milton Boutte's Motion to Dismiss the Indictment, as to Milton Boutte, Pursuant to Federal Rules of Criminal Procedure 12(b)(3)(B)(iii) and 12(b)(3)(B)(v) [Doc. 34];

3. **DENIES** Defendant George Lowe's Motion to Dismiss Untimely Indictment [Doc. 61]; and

4. **DENIES** Defendant Arturo Vargas's Motion for a Bill of Particulars [Doc. 69].

IT IS SO ORDERED.


Entered for the Court
this the 21st day of August, 2018

/s/ Joel M. Carson III_____
Joel M. Carson III
United States Circuit Judge
Sitting by Designation