IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                            1:17-cr-3338-JMC

MILTON BOUTTE,
JOE DIAZ,
ARTURO VARGAS,
and GEORGE LOWE,

       Defendants.

**<u>ORDER CONSTRUING THE UNITED STATES' NOTICE OF INTENT TO
INTRODUCE CO-CONSPIRATOR STATEMENTS AS A MOTION TO
INTRODUCE CO-CONSPIRATOR STATEMENTS AND GRANTING
IN PART AND DENYING IN PART THE UNITED STATES' MOTION</u>**

On November 19, 2018, the government filed a notice of intent to introduce co-conspirator statements. On September 13, 2019, the Court held a *James* hearing to determine the admissibility of the alleged co-conspirator statements under Federal Rule of Evidence 801(d)(2). Following a half-day hearing, the Court granted Defendant Boutte additional time to cross-examine the government's witness. At the end of the hearing, the Court told Boutte it would accept a proffer of witness testimony in lieu of Boutte's four witnesses testifying. Defendant Boutte submitted that proffer on September 27, 2019. On November 1, 2019, the Court held a continued *James* hearing. At the hearing, the United States offered the testimony of Colin Feeney, an investigative auditor with the United States Department of Defense who investigated the alleged crimes at issue. After considering the government's notice, which the Court construes as a motion and the evidence presented at the hearings, Boutte's proffered witness testimony, and relevant law, the Court grants in part and denies in part the government's motion for the reasons set forth below.

I.

As an overarching matter, Defendants were all generally affiliated with the Big Crow Program Office ("BCPO") at Kirtland Air Force Base in Albuquerque, New Mexico, and allegedly committed their crimes in conjunction with their ties to that office. BCPO, in turn, functioned as the airborne component of the United States Army's electronic warfare assessment program beginning in 1971. The Army principally funded BCPO in its early years. In the late 1990s, however, the Army's funding for and need of BCPO started to dwindle. BCPO's ever-diminishing assets, money, and utility eventually led it to shut down for good in 2009.

Near the end of BCPO's run—"not later than 2004," claims the indictment—Defendant Milton Boutte, the then-Director of BCPO, allegedly began to engage in illegal activities with others "to obtain money for [BCPO]." Specifically, the indictment alleges that Boutte "conspired and schemed" with Defendant George Lowe and "other lobbyists, consultants, and contractors" to lobby Congress and other government agencies for money for the benefit of BCPO. The problem for Boutte was that the lobbyists—especially Lowe—charged hundreds of thousands of dollars for their work. How were Boutte and BCPO to pay for these services?

From a legal perspective, the government alleges that Boutte could not use funds appropriated to BCPO by Congress to pay for Lowe's lobbying activities. For one thing, Congress did not authorize or appropriate funds to BCPO to expend money for lobbying. *See* U.S. Const. art. I, § 9, cl. 7; 31 U.S.C. § 1341(a)(1)(B) ("An officer or employee of the United States Government . . . may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."). And in the absence of that express congressional authorization, 18 U.S.C. § 1913—a criminal statute—forbids federal

officers and employees from using *any* appropriated money to engage in activities that could be broadly characterized as lobbying.

According to the government, Boutte and Lowe chose to take an illegal route. In so doing, the two men turned to the 1953 Small Business Act—specifically, § 8(a) of that Act, wherein Congress established the Business Development Program. 15 U.S.C. § 637(a). Put briefly, the § 8(a) Business Development Program authorizes the government to assist eligible small businesses to help them get off the ground. One way the government does that is by awarding eligible small businesses "sole-source contracts"—that is, contracts entered into without engaging in open competition or a competitive process. As a practical matter, this means that on any given project the government will select a § 8(a) small business as its contractor without first making that small business compete with other potential contractors for its services.

The indictment alleges that Boutte and Lowe realized they could misappropriate funds from § 8(a) sole-source contracts to pay for Lowe's lobbying efforts and other unauthorized expenses. But to do so, they needed—obviously enough—small businesses. Thus the two men allegedly further "conspired and schemed" with Defendants Joe Diaz and Arturo Vargas, two small business owners, to "fraudulently obtain and exploit" § 8(a) sole-source contracts for that illegal purpose.

Diaz was the first small business owner to allegedly lend illegal support by misappropriating a § 8(a) sole-source contract. He owned a controlling interest in a small business known as Miratek Corporation ("Miratek"), and in due time he enrolled Miratek in the § 8(a) Business Development Program. The United States eventually awarded a sole-source contract under § 8(a) to Miratek in 2004 to provide various "technical services" to BCPO ("Miratek Contract"). Diaz then allegedly conspired with Boutte and Lowe to fraudulently divert money

from the Miratek Contract to pay Lowe's lobbying fees and other unauthorized expenses. According to the indictment, for instance, Diaz falsely represented that Lowe was an employee of Miratek, and the men would then submit invoices claiming false and fictional hours of work for supposed services that Lowe provided. The total amount unlawfully diverted added up to more than $529,000.

The Miratek Contract, however, could not indefinitely support the confederates' supposedly fraudulent scheme. Funding under that contract slowly had been exhausted, and under the terms of § 8(a), Miratek could no longer participate in the Business Development Program after utilizing it for so many years. Thus, to keep the lobbying and allegedly fraudulent payments moving along, Boutte and Diaz sought another small business that could seamlessly fill Miratek's role in the scheme.

Enter Arturo Vargas. Vargas, a Certified Public Accountant doing business as Vargas P.C., had served as Diaz's and Miratek's accountant for nearly sixteen years. Yet in early 2005, Vargas and Diaz teamed up before the Small Business Administration to take Vargas P.C. in an entirely new direction. Among other things, the two men informed the Small Business Administration that Vargas P.C. was expanding and diversifying into the information technology field. They further informed the administration that as it did so, they hoped to have Miratek—and, by extension, Diaz—serve as Vargas P.C.'s small business mentor. Under the terms of § 8(a), protégé/mentor relationships were allowed. The Small Business Administration agreed to their request.

Leveraging their new protégé/mentor relationship, Vargas and Diaz eventually asked the Small Business Administration in late 2005 for permission to combine their services under a joint venture called Vartek, LLC ("Vartek") so they could work together to provide "technical and analytical expertise" to BCPO. Section 8(a) expressly allows such joint ventures in certain

circumstances, and Vartek seemingly satisfied the requisite conditions. The Small Business Administration thus approved the joint venture. The government eventually awarded *two* § 8(a) sole-source contracts to Vartek ("Vartek Contract 1" and "Vartek Contract 2," respectively).

Among other allegations in the indictment, Diaz and Vargas then proceeded to falsely represent that Lowe was an employee of Vartek, and the men would then submit fraudulent invoices claiming fictional hours of work for services Lowe supposedly provided. All in all, Diaz and Vargas allegedly misappropriated at least $506,000 in funds from the two contracts to pay Lowe for his lobbying activities and more than $5,800,000 in funds to pay other lobbyists, consultants, and contractors.

Notably, the indictment also outlines at least one instance where Lowe's lobbying efforts on behalf of BCPO over the years actually succeeded. In early 2005, while the Miratek Contract was still in play, Lowe allegedly informed Boutte, Diaz, and their agents that the Alaska Army National Guard was set to transfer $1,185,000 to BCPO. That large sum eventually came through and was added to the funding under the Miratek Contract. The indictment then alleges that Lowe demanded and eventually received most of that transferred money (or equivalent sums) as payment for his services, which effectively rendered BCPO's initial receipt of the funds from the Alaska Army National Guard useless.

In addition to the four indicted Defendants, the government alleged that three unindicted individuals also conspired with Defendants: Ron Unruh, a contract specialist for Miratek; Nick Toomer, a consultant for Edgewater Technologies who allegedly funneled payments to Lowe; and Arturo Herrera, a Miratek accountant.

II.

Federal Rule of Evidence ("Rule") 801(d)(2)(E) provides that a statement is not hearsay if the statement is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Before admitting such co-conspirator, out-of-court statements as non-hearsay, the United States must prove by a preponderance of the evidence that: (1) "a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course and in furtherance of the conspiracy." *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). "Statements by a conspirator are in furtherance of the conspiracy when they are 'intended to promote the conspiratorial objectives.'" *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)). This promotion occurs through statements that "explain events of importance to the conspiracy in order to facilitate its operation, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, and statements of a coconspirator identifying a fellow coconspirator." *Id.* (internal quotation marks, citations, and brackets omitted).

The "strongly preferred" procedure for addressing the admissibility of co-conspirator statements in this Circuit is for the district court to hold a *James* hearing, *see United States v. James*, 590 F.2d 575 (5th Cir. 1979), outside the presence of the jury. *Owens*, 70 F.3d at 1123. In making the decision whether the government has satisfied its burden at a *James* hearing, "the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Id.* at 1124. But in addition

to the statements, the government must present "some independent evidence" connecting the defendant to the conspiracy. *Id.* at 1124–25. "[S]uch independent evidence may be sufficient even though it is not 'substantial.'" *Id.* at 1125 (quoting *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)).

Importantly, for purposes of Rule 801(d)(2)(E), the government need not prove that the conspiracy was for an unlawful purpose. *United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986). Rather, the government must prove merely that a "combination" existed between the defendant and third parties. *Id.*; *see also United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (stating that a conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a "lawful joint undertaking"); *United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009) ("Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise."). Thus, the government may show a conspiracy by providing evidence that the alleged conspirators merely engaged in a joint plan that was non-criminal in nature. *Nelson*, 732 F.3d at 516. Accordingly, "a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party." *Id.* Rule 801(d)(2)(E) "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983).

## III.

At the *James* hearing, Agent Feeney testified about the alleged relationship between the alleged indicted and unindicted co-conspirators. Agent Feeney testified that the purpose of the alleged conspiracy was to enlist Lowe to lobby on behalf of the BCPO; to actually have Lowe

lobby on behalf of the BCPO; to pay Lowe for his lobbying services on behalf of the BCPO; to generate fraudulent invoices in order to pay Lowe for his lobbying services; and to recoup that money from the United States Government. Feeney stated that Boutte was so desirous to obtain funding for the BCPO that he hired Lowe to lobby. After Lowe and Boutte agreed to payment terms, Feeney said Boutte used his position as BCPO director to force others—Diaz, Unruh, Herrera, and Toomer—to participate in the conspiracy. Lowe started submitting fraudulent invoices for his time.

In addition to Feeney's testimony regarding the conspiracy and the statements at issue, the government pointed to the plea agreements of cooperating Defendants Diaz and Vargas. *See United States v. DeLeon*, 287 F. Supp. 3d 1187, 1202 (D.N.M. 2018) (admitting plea agreements as documentary evidence); *United States v. Biglow*, 2012 WL 589270, at *4 (D. Kan. Feb. 22, 2012) (using plea agreements as "independent evidence" conspiracy existed). In his plea agreement, Diaz admitted entering into a sole-source contract with the Department of Interior. The government awarded Miratek task order D0400160001 under that contract. The statement of work for the task order required Miratek to provide technical and analytical support services to BCPO on a time and materials basis. The order ended up authorizing Miratek to provide over one million dollars of services to the BCPO. Around that same time, Boutte retained lobbyists and consultants to lobby Congress, federal agencies, and federal military and civilian authorities for funds for the BCPO. Diaz said that some, but not all, of the contractors Boutte secured provided equipment, facilities, tuition reimbursement for relatives, and non-technical services not encompassed in the statement of work. Boutte demanded that Miratek pay the lobbyists, consultants, and contractors he retained. Diaz said Miratek did so with the funds allocated under the DOI task order. Diaz admitted that although he knew diverting federal funds from the task order to pay the lobbyists

and consultants was not permitted by law or authorized by the contract, he acquiesced and agreed to fraudulently claim and misapply the government funds. According to Diaz, Boutte personally demanded that Miratek pay Lowe's fees and made threats towards him and Miratek if he failed to make the required payments. Diaz admits to concealing and disguising the nature of the payments to Lowe. He said he engaged in false billing and asked Lowe to falsely and fraudulently restructure his flate-rate invoices to hourly invoices.

Lowe informed Diaz and Boutte that he had arranged for a transfer of more than one million dollars from or through the Alaska Army National Guard through a Military Interdepartmental Purchase Request ("MIPR") to the Department of Interior for the BCPO's benefit. Diaz stated that is when Lowe's demands for money increased significantly. Diaz says Boutte and his representative rebuffed his efforts to resist Lowe's increased payment demands. Miratek continued to incorporate Lowe's charges in claims for payment made to the Department of Interior. To avoid detection, they restructured Lowe's large claims in several invoices. By the time the funding ran out on the task order, Lowe's payment demands accounted for more than half of the MIPR he had secured and a significant portion of the remaining amounts were used to pay for other consultants and contractors Boutte hired.

In order to perpetuate the conspiracy and scheme to pay Boutte's consultants, Diaz said he conspired with Boutte and Vargas to have another sole-source contract awarded to Vartek. Diaz says that he and Vargas made "materially untrue" statements to obtain the contract. He said Vartek served as a vehicle through which they fraudulently claimed and diverted government funds to pay Boutte's lobbyists, consultants, and contractors. The government awarded Vartek two contracts to support BCPO. Diaz admits he, Boutte, Vargas, and others conspired and combined to make

claims under those contracts to pay Boutte's lobbyists despite the contract not authorizing such expenditures.

Diaz said that during the time of the conspiracy, Miratek and Vartek received approximately $8.4 million from the government and that Boutte required the companies to pay nearly $4.1 million in illegal payments to lobbyists, consultants, and contractors. In total, Miratek paid Lowe over $880,000 pursuant to Boutte's demands. Vargas's statement in his plea agreement echoes Diaz's statements—admitting that he conspired with Boutte and Diaz to pay lobbyists and consultants from the appropriated monies they received pursuant to the sole-source contracts.

Despite the government agent's testimony, the government's proffer, and the statements themselves, Boutte argues that the government has not met its burden to show a conspiracy by a preponderance of the evidence. Boutte believes this for several reasons. First, he argues that the government's case rests on testimonial evidence rather than documents, which presents a *Crawford*[1] issue. Second, he contends that the content of the documents produced in discovery and the proffered testimony of his four witnesses refutes the government agent's testimony. Third, he asserts Agent Feeney's testimony was inadequate as independent evidence. Fourth, he argues that Unruh and Diaz have motive to lie. Fifth, he points out that he was not copied on some of the emails while other alleged co-conspirators are on many more emails. The Court addresses the arguments in turn.

A.

The Court first turns to Boutte's *Crawford* objection. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 68

---

[1] *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

(2004), the Supreme Court stated that admission of testimonial hearsay at trial violates the Confrontation Clause unless the declarant testified or was previously subject to cross-examination regarding the objectionable statements if he was not available. Although the Supreme Court did not provide an exact definition of "testimonial", the Tenth Circuit has expressly stated that *Crawford's* instruction on testimonial hearsay did not eviscerate Federal Rule of Evidence 801(d)(2)(E), especially because Rule 801(d)(2)(E) treats co-conspirator declarations not as an exception to the hearsay rules, but as non-hearsay. *See Townley*, 472 F.3d at 1273 (noting that *Crawford* did not overrule *Bourjaily v. United States*, 483 U.S. 171 (1987), which held that a court need not independently inquire into the reliability of statements of coconspirators where Federal Rule of Evidence 801(d)(2)(E) is at play).

In this case, the government seeks to introduce sixty-three alleged co-conspirator statements made in emails and six alleged verbal co-conspirator statements. The Court concludes that the alleged co-conspirator statements contained in the emails themselves are not testimonial. The co-conspirators did not make the statements to law enforcement but rather to each other in furtherance of the alleged conspiracy. At the time the alleged co-conspirators made the statements, a reasonable person in their positions would not objectively foresee that their statements might be used in the investigation or prosecution of a crime. *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005). In fact, many of the emails instead demonstrate an attempt to perpetuate a plan in a manner designed to avoid detection, investigation, and prosecution. Accordingly, the Court has no reason to doubt the reliability of the statements. In contrast, the six verbal statements the government seeks to admit as co-conspirator statements are testimonial in nature. The co-conspirators made these verbal statements to investigators at a time when a person in their positions

would objectively foresee that their statements might be used in the investigation or prosecution of a crime.[2]

Diaz and Vargas's plea agreements are also testimonial in nature. The Tenth Circuit has not specifically addressed whether *Crawford* extends beyond a trial to pretrial hearings.[3] Courts that have addressed the issue have held that *Crawford* does not extend to pretrial hearings not constitutionally mandated. *See, e.g.*, *Peterson v. California*, 604 F.3d 1166, 1169 (9th Cir. 2010) (holding that the right to confrontation is a *trial* right not constitutionally required at preliminary or pretrial hearings). Although the government indicated at the *James* hearing that Diaz and Vargas will testify at trial, which appears to remedy any *Crawford* issue, because this question is unsettled, and because the Court can base its ruling on Agent Feeney's testimony and the statements themselves, the Court need not consider Diaz and Vargas's plea agreements in reaching its decision on the admissibility of the co-conspirator statements, although the agreements clearly support admissibility.

## B.

Boutte next argues that when looking at the exhibits he introduced at the *James* hearing and the witness testimony he proffered, no matter what Agent Feeney said under oath, the government cannot meet its burden for admission of the statements. Boutte argues that the government did not charge him with violating the anti-lobbying statute. Instead, he argues that because the government charged him with violating 18 U.S.C. § 286—conspiracy to defraud the

---

[2] The Court notes that its decision not to admit some statements into evidence under Rule 801(d)(2)(E) does not mean that those statements could not be admitted under a different hearsay rule or for purposes of impeachment at trial.

[3] Counsel for Lowe did not join counsel for Boutte with respect to the contention that the plea agreements cannot be considered under *Crawford*.

Government with respect to claims—the government must also prove by a preponderance that he concealed his actions. That, Boutte claims, the government cannot do. For support he turns to the exhibits admitted at the *James* hearing.[4]

As to the exhibits, Boutte asserts that they show the alleged co-conspirators did not conceal the alleged conspiratorial acts. He points to various invoices, emails, contract modifications, and other documents. He argues contract modifications show that he was allowed to engage consultants and congressional liaisons. Accordingly, Boutte argues, the activity was not unlawful or unauthorized. He says the documents will also show that the government encouraged the use of consultants and congressional liaisons to seek out sustainment funding. Boutte further contends the documents do not show his involvement in or acknowledgment of a conspiracy. He says the documents do not show that he directed others to commit the acts that form the basis of the conspiracy and that they do not show he had the intent to enter an agreement for unlawful purposes. Finally, he argues the documents do not show he had an intent to deceive.

Boutte also offered testimony of four witnesses.[5] In making the determination as to whether the government has met its burden, the Court has fully considered Boutte's witness proffer. Boutte first offered the proffer of General Robert Rego, an individual who worked with

[4] The Court allowed the government the opportunity to reserve its position on the exhibits Boutte proposed at the hearing and to file written objections after obtaining the transcript of the hearing. The government informed the Court that it has no objection to the Court reviewing and considering any and all of the exhibits Boutte referenced at the *James* hearings for the purpose of making a preliminary determination of the admissibility of the listed co-conspirator statements. Accordingly, the Court admits all the exhibits for purposes of the *James* hearing and has considered them in reaching its decision. The Court notes that not all exhibits may be admissible at trial.

[5] The Court notes that a *James* hearing is not a "mini-trial." An extensive witness proffer offered by a defendant is not the normal practice for the United States District Court for the District of New Mexico in determining whether sufficient threshold evidence of a conspiracy exists. The Court, however, allowed Boutte to present his proffer. The Court notes that Lowe's counsel has agreed with the Court's method of proceeding throughout this criminal action.

BCPO. His testimony focused on the fact that the government was aware that the BCPO was left to its own devices to obtain funding and that fee-for-service organizations had fewer restrictions. Victor John Lewis and Christopher Robertson both proffered testimony regarding Boutte's duties and what he did and did not have knowledge of. Boutte said Lewis would testify that Boutte concealed nothing from the contracting officers and that Boutte was not involved with invoicing. Lewis would also testify as to the involvement of "graybeard" consultants. Robertson would also testify as to Boutte's non-involvement in invoicing and payments and "graybeard" involvement. Robertson would additionally testify that alleged co-conspirator Unruh dealt with invoices and would also testify as to Unruh's character.

Boutte also proffered the testimony of Robert Magnuson, his expert and a former contract and fiscal law attorney for the United States Army Space and Missile Defense Command. Magnuson would testify that the documents show Boutte did not participate in any conspiracy. Rather, the documents show that Boutte was deliberately shielded from a conspiracy so Unruh could do whatever he wanted. Magnuson would testify that Lowe's services were logical and legal so that BCPO employees could spend time on other projects. He would provide expert testimony that under the anti-lobbying statute, lobbying is not per se illegal. He would testify that contracting officers approved statements of work and had the authority under applicable regulations to approve consultants to include legal forms of lobbying on behalf of BCPO. Magnuson would testify that the Alaska National Guard deal was appropriate. Magnuson would testify as to his understanding of terms and argue that the government's charges are not supportable. He asserts the government has no documentary proof that the MIPR was illegal. He points to the fact the government has no evidence that a contracting officer was ever concerned. He also says that Miratek signed an agreement with Lowe and the alleged illegality, if any, is solely on Miratek. Magnuson states the

government has no documentary evidence that Boutte was involved in the Miratek agreement or the decision by Miratek to structure the payments to Lowe. He says the government has provided no evidence that the payment structure was illegal. Even if Lowe's hours were inaccurate, no documentary evidence shows that Boutte was aware of the issue. Magnuson would testify no tangible link exists between Boutte and Miratek. He says no written evidence supports statements concerning demands of payment and threat of termination alleged against Boutte and that the government has no evidence of Boutte making threats. Magnuson asserts that only the parties whose interest it is in to assert this are parties who benefit because of various agreements with the government. Magnuson would testify that Boutte expected Unruh to give sound advice. Unruh was the person who approved the statement of work for Miratek and Vartek. He would testify that they contemplated meetings with Congress and that was open and notorious. Magnuson would testify a conspiracy and fraud against the government occurred, but the government has no contemporaneous documentation that Boutte was aware of the Miratek arrangement with Unruh or that Boutte approved it. Magnuson would state only Diaz, Herrera, and Unruh were clearly aware of the conspiracy and fraud upon the contracting officers. Magnuson would also offer insight into the contracting process.

In summary, Boutte, through the documents the government has produced and that the Court admitted for purposes of the *James* hearing, as well as the proffered testimony, seeks to show that he did not conceal any of the alleged acts and that his actions were not unlawful or unauthorized. Lowe too argues that the government did not establish a scheme or artifice to defraud. Even if true—a possibility that the alleged co-conspirator statements in the emails appear to refute—a "conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a 'lawful joint undertaking.'" *Nelson*, 732 F.3d at 516

(quoting *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011)). "A conspiracy may be shown 'merely be engaging in a joint plan[ ] . . . that was non-criminal in nature.'" *Id.* (quoting El-Mazain, 664 F.3d at 502). Therefore, "a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party." *Id.*

The government has demonstrated a joint undertaking to secure funding for BCPO. To accomplish this goal, Boutte hired Lowe—a fact Boutte appears to admit. Whether Boutte or Lowe's actions within that joint enterprise were criminal in nature is immaterial at this point. *See Brockenborrugh*, 575 F.3d at 735–36 (concluding that the defendant and his realtor were engaged in a lawful joint enterprise to acquire property and the realtor's statements to the seller's lawyer that the defendant was interested in buying the property were made in furtherance of this enterprise and properly admitted under Rule 801(d)(2)(E)); *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979) (concluding a district court could admit a ship's logbook under the co-conspirator exception because the ship's crew was engaged in the voyage of the ship, which was a joint venture in and of itself apart from the illegality of its purpose). Put simply, the government here has established that a combination existed among the alleged co-conspirators, including Boutte and Lowe. *See Bucaro*, 801 F.2d at 1232 (holding that the government need not prove that the conspiracy was for an unlawful purpose); *Brockenborrugh*, 575 F.3d at 735 (stating that admission of statements is not contingent upon the finding of an unlawful combination). That Boutte believes the evidence shows his participation in the endeavor was legal does not defeat admissibility and is a question the jury must decide.

Moreover, the law is not altered merely because the government chose to indict Boutte and Lowe under 18 U.S.C. § 286. *See Nelson*, 732 F.3d at 516 (noting that the requirements for conspiracy as a crime are not the same as the requirements for conspiracy as a hearsay exception).

Concealment is not an element of the crime. That section provides that "[w]hoever enters into any agreement, combination, or conspiracy to defraud the United States . . . by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim" shall be fined or imprisoned. 18 U.S.C. § 286. Indeed, both Boutte and the government acknowledged that when they submitted their proposed jury instructions. Specifically, Boutte listed as the elements of that crime:

> First: Defendant agreed with at least one other person to carry out a scheme to defraud;
> Second: the Defendant knew the unlawful purpose of the plan and willfully joined in it; and
> Third: the plan was to defraud the Government by obtaining the payment or allowance of a claim based on a false or fraudulent fact.

Whether Boutte and Lowe's conduct was authorized is not an element of the crime. Rather, it is an affirmative defense to the government's allegation that Boutte and Lowe schemed to defraud the government by using appropriated government funds to pay a lobbyist. At the *James* hearing, Boutte's attorney stated that he was not seeking to assert a public authority affirmative defense. That statement is in express conflict with Document No. 155, Defendant Milton Boutte's Notice of Public Authority Affirmative Defense, in which Boutte "claims to have acted with public authority . . . throughout the periods leading up to and covered by the contracts at issue in the indictment." Finally, to the extent that the government used the words "concealment" and "unauthorized" in the applicable count of the indictment, "[s]urplusage in an indictment need not be proved." *United States v. McVeigh*, 153 F.3d 1166, 1196 (10th Cir. 1998).

## C.

Additionally, Boutte takes issue with Agent Feeney's testimony at the hearing and whether it was adequate independent evidence of a conspiracy. Boutte asserts Feeney is not knowledgeable on simple terms and the specifics of the case, conjecturing that might be because he was not

involved in the case until 2018.  Boutte argues that his testimony ignored exceptions to the anti-lobbying statute and other factors that would make the activity lawful.

For the reasons stated in the previous section, whether Boutte's actions within the joint enterprise were criminal in nature is immaterial.  *See Brockenborrugh*, 575 F.3d at 735–36.  Agent Feeney testified as to the existence of the plan to obtain funding for the BCPO by obtaining a lobbyist, which would be paid through appropriated government funds.  Agent Feeney testified how Boutte, Lowe, and the other conspirators worked together to accomplish that common plan.  The Court concludes Agent Feeney's testimony, although not irrefutable, was sufficiently reliable independent evidence to establish by a preponderance of the evidence that a conspiracy existed and that Boutte and Lowe were part of that conspiracy.

### D.

Fourth, Boutte argues that Unruh and Diaz have motive to lie and that their statements are therefore unreliable.  The Court does not agree.  Although Unruh and Diaz may have had motive to lie once they discovered that their statements may influence a criminal investigation, that risk is not present when co-conspirators make statements to each other in furtherance of a conspiracy.  *United States v. Simmons*, 923 F.2d 934, 954 (2d Cir. 1991) (citing *Bourjaily*, 483 U.S. at 182).

### E.

Fifth, Boutte argues that he was not copied on some of the emails while other alleged co-conspirators are on many more emails.  The Court does not believe this diminishes the government's evidence presented at the hearing.  Lowe too argues that the government did not prove Lowe's willful knowing participation in a criminal enterprise.[6]  Although the co-

---

[6] Counsel for Defendant Lowe participated in both hearings and effectively examined the government's witness and presented argument to the Court.  Counsel for Lowe did not, however,

conspirators may have sent Boutte less direct emails, many of the emails copy Boutte or reference both his and Lowe's knowledge of the alleged conspiracy.[7]

One example of such a situation occurs in email number 36. In that string of emails, Ron Unruh and Joe Diaz discuss Lowe's payment terms. In one email in this chain, Unruh laments Lowe's demands: "Now he wants to talk to us about diversion of funding -- what does he think they will do for a lobbyist who has funding sent through an organization just so he can get it all?" He continues: "The scary part is that [Lowe] is calling all these offices and someone will pin a tail on the donkey pretty quickly if he does not back off." Diaz responds to Unruh by saying "Nick Toomer had me call Milt [Boutte] yesterday and I gave him a brief summary on our situation. Milt sounded tired and stressed." In another portion of the email, Unruh tells Diaz: "Here is what Milt has decided to do. He wants me to send all the rest of the money to another contractor to pay [Lowe]."

In email number 46, Ron Unruh tells Nick Toomer that they needed to "lay off a little" in their interactions with Lowe. Unruh told Toomer, "Every time someone talks to George Lowe he calls Milton and moves the pay date further forward . . . I do not want to see this story in the Albuquerque Journal or the Atlanta Tribune." In email 48, Joe Diaz tells Unruh and Art Herrera: "We are under heavy pressure again from [Lowe]/Milt, etc., to get another payment out before the end of this month."

The government has presented the Court with many other emails which show the co-conspirators were keeping Boutte in the loop. Even if Boutte and Lowe were not recipients or

_____

join all Boutte's arguments. Thus, in addressing the various arguments, the Court mentions Lowe only to the extent he joined in or presented specific arguments.

[7] Boutte does not provide any evidence in his extensive proffer that he ever disavowed any of the statements made in the emails on which he was copied.

authors of every email, the emails themselves along with Agent Feeney's testimony meet the necessary evidentiary threshold to show both Boutte and Lowe's awareness of and involvement in the scheme to pay Lowe.

F.

Based on the government's proffer of the conspiracy, Agent Feeney's testimony, and the co-conspirator statements themselves, the Court concludes, by a preponderance of the evidence, that Boutte, Lowe, Diaz, Vargas, Unruh, Herrera, and Toomer were members of a joint enterprise or venture. The government presented evidence that the alleged conspirators combined to secure funding for BCPO through hiring lobbyists, which they would pay using appropriated funds from sole-source government contracts. The Court emphasizes that it makes this finding by a preponderance of the evidence and only to determine preliminary questions regarding whether evidence is admissible. Fed. R. Evid. 104(a). Notwithstanding this finding, the Court presumes Defendants Boutte and Lowe are innocent.

"Statements by a conspirator are in furtherance of the conspiracy when they are intended to promote the conspiratorial objectives." *Townley*, 472 F.3d at 1273 (internal quotation marks omitted). The Court focuses not on the statement's "actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993).

The Court concludes that many of the emails show an intent of the alleged co-conspirators to promote the conspiratorial objectives. The Court will allow the government to introduce the following emails at trial as nonhearsay: 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 31, 32, 33, 35, 36, 37, 38, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, and 63.

Email number 1 from Boutte to Lowe set the alleged conspiracy into motion. Emails 11, 12, and 13 set forth Lowe's actual lobbying services. Emails 14, 16, 19, 21, and 23 evidenced meetings to promote the conspiratorial objectives. Emails 2–6, 8–10, 15, 17, 20, 22, 25–29, 31–33, 35–38, 41–49, and 51–63 all helped facilitate the operation of the joint enterprise by discussing Lowe's payment terms and demands and how they would structure those payments.

The Court will not admit emails 7, 18, 24, 30, 34, 39, 40, and 50 at this time. The government withdrew emails 7, 18, 24, and 30. Emails 34, 39, 40, and 50 do not appear to promote any enterprise objective. The Court disagrees with the government that any time one co-conspirator speaks to another that that communication must be in furtherance of a conspiracy. The Court will likewise not admit the six verbal statements at this time. All denials are without prejudice.

## IV.

For the reason set forth above, the Court CONSTRUES the government's notice of intent to introduce co-conspirator statements (Doc. No. 120) as a motion to introduce co-conspirator statements and GRANTS IN PART and DENIES IN PART that motion.

IT IS SO ORDERED.

Entered for the Court
this the 13th day of January, 2020

/s/ Joel M. Carson III_____
Joel M. Carson III
United States Circuit Judge
Sitting by Designation